## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOSE MUNIZ,

          Plaintiff,

vs.

STOBER; STöBER ANTRIEBSTECHNIK
GmbH + Co. KG; BREYER Gmbh
MASCHINENFABRIK; KLUBER
LUBRICATION NA LP; ABC, Inc. (I-V);
and JOHN DOES (I-V), being fictitious,
jointly, individually and in the alternative,

          Defendants.

Civil Action No. 5:18-cv-04619-JLS

## <u>ORDER</u>

AND NOW THIS _____ day of _____, 2022, upon consideration of the

Motion for Summary Judgment of Defendant Breyer GmbH Maschinenfabrik, and Plaintiff's

response thereto, IT IS HEREBY ORDERED that the Motion is GRANTED.  Plaintiff's First

Amended Complaint is DISMISSED WITH PREJUDICE.

BY THE COURT:

_____

Jeffrey L. Schmehl, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOSE MUNIZ, | Civil Action No. 5:18-cv-04619-JLS |
| Plaintiff, | |
| vs. | |
| STOBER; STÖBER ANTRIEBSTECHNIK GmbH + CO. KG; BREYER Gmbh MASCHINENFABRIK;KLUBER LUBRICATION NA LP; ABC, INC. (I-V); and JOHN DOES (I-V), being fictitious, jointly, individually and in the alternative, | |
| Defendants. | |

## MOTION FOR SUMMARY JUDGMENT OF DEFENDANT BREYER GMBH MASCHINENFABRIK

Breyer GmbH Maschinenfabrik ("Breyer") respectfully moves for summary judgment in its favor and against Plaintiff, Josue Muniz. In support of its motion, Breyer relies on the accompanying Joint Statement of Stipulated Material Facts, Supplemental Statement of Material Facts and Brief.  Breyer respectfully requests oral argument on the motion.

Respectfully submitted by:

*Attorneys for Defendant,*
*Breyer GmbH Maschinenfabrik*

WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP

By:____ */s/ Michael S. Takacs*_____
       Michael S. Takacs
2001 Market Street, Suite 3100
Philadelphia, PA 19103
Tel.:   (215) 627-6900
Fax:   (215) 627-2665
michael.takacs@wilsonelser.com

-and-

WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP

Frederick W. Reif, *admitted pro hac vice*
Debra A. Tama, *admitted pro hac vice*
140 East 42nd Street
New York, NY 10017
Tel.:   (212) 490-3000
Fax:    (212) 490-3038
frederick.reif@wilsonelser.com
debra.tama@wilsonelser.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOSE MUNIZ,<br><br>        Plaintiff,<br><br>vs.<br><br>STOBER; STÖBER ANTRIEBSTECHNIK GmbH + CO. KG; BREYER Gmbh MASCHINENFABRIK;KLUBER LUBRICATION NA LP; ABC, INC. (I-V); and JOHN DOES (I-V), being fictitious, jointly, individually and in the alternative,<br><br>        Defendants. | Civil Action No. 5:18-cv-04619-JLS |

## JOINT STATEMENT OF STIPULATED MATERIAL FACTS

Plaintiff Josue Muniz ("Plaintiff") and Defendant Breyer GmbH Maschinenfabrik ("Breyer") submit the following Joint Statement of Stipulated Material Facts in connection with Breyer's Motion for Summary Judgment directed to Plaintiff's First Amended Complaint filed August 26, 2019 at ECF No. 32 (the "FAC").[1] Subheadings are for purposes of organization and reference only, and are not statements of fact.

### Procedural History

1.      On or about October 25, 2018, Plaintiff brought suit by way of Complaint against a number of defendants including Breyer, Suntuf USA, and Palram Americas. (ECF No. 1).

---

[1]      On a motion for summary judgment, a court "(i) resolve[s] conflicting evidence in favor of the nonmovant, (ii) do[es] not engage in credibility determinations, and (iii) draw[s] all reasonable inferences in favor of the nonmovant. *Fuentes v. Perskie,* 32 F.3d 759, 762 n.1 (3d Cir. 1994). Accordingly, the parties agree that the following facts are stipulated as undisputed solely for the purposes of summary judgment.

2.      On or about November 13, 2018, Plaintiff filed a Stipulation of Dismissal as to Defendant Suntuf USA.  (ECF No. 3).

3.      On or about December 3, 2018, Plaintiff filed a Stipulation of Dismissal as to Defendant Palram Americas.  (ECF No. 4).

4.      On or about May 20, 2019, Defendant Breyer filed an Answer to Plaintiff's Complaint.  (ECF No. 16).

5.      On or about August 26, 2019, Plaintiff filed the FAC, attached at Exhibit A.

6.      On or about September 20, 2019, Breyer filed its Answer to Plaintiff's Amended Complaint, attached at Exhibit B.

### The Machine

7.      The Machine was "custom made," the only one of its kind, based upon specifications provided by Paltough Industries, believed to be the parent company of Suntuf USA. (Exhibit C, pp. 10:22-11:11; 19:17-24; 83:13-85:1); (*see, e.g., id*, at pp. 83:18-84:5, describing that Paltough/Suntuf provided "specifications" for a machine that would be a stand-alone device that could be used off-line for cutting smaller plastic pieces that could not be done during the in-line process).

### Operating History of the Machine

8.      Breyer did not install the Machine, and did not perform any repairs, maintenance, or modifications to the Machine after it was delivered.  (*Id.* at pp. 66:13-67:7).

9.      Discovery evidences that the Machine was used for several years, and was then out of service for a time before the Accident.  (Transcript Excerpts Deposition of Henry Edward Jennings, taken July 19, 2021, attached as Exhibit D, at pp. 14:10-16:24).

10.     The product was recommissioned for use in cutting plastic scrap so it could be recycled.  (*See* Witness Statement of Luis Lopez, undated, OSHA Investigation File, attached as Exhibit E, at p. 2; *see also* Transcript Excerpts Deposition of Robert Levin Dando, taken September 30, 2021, attached as Exhibit F, at pp. 18:4-13 *and* Transcript Excerpts Deposition of Jonathan Spell, taken March 31, 2021, attached as Exhibit G, at pp. 17:23-18:10).

11.     The Machine was originally kept in the "old warehouse" of the Facility until it was moved to the "P-3 warehouse," an area used for raw materials handling and scrap preparation, sometime before the Accident occurred.  (Exhibit D at pp. 19:20-20:11; Exhibit F, at pp. 13:22-16:15; Exhibit G, at p. 18:8-10).  Temporary workers were hired for the scrap cutting process. (Exhibit G, at pp. 21:22-22:7).

12.     The Machine was destroyed by Palram in 2020, cut into pieces and thrown into a scrap steel dumpster.  (Exhibit D, at pp. 37:8-18).  Neither Breyer nor Mr. Muniz were notified that the Machine was going to be destroyed.  Breyer never had an opportunity to inspect the Machine after the Accident.

### Machine Operating Instructions

13.     Breyer's documentation department generated operating and safety instructions for the Machine that covered intended use, its functions, and operational warnings.  (Exhibit C, at p. 76:8-16); (*see also* Operating Instructions for Cross Cutting Device and Pick Up Table, dated 2002, referred to hereinafter as the "Operating Instructions," Bates-stamped BREYER000023-66, attached as Exhibit H, *and* Suntuf USA Safety, dated 2002, referred to hereinafter as the "Safety Instructions, Bates-stamped BREYER000067-86, attached as Exhibit I).

14.     With respect to "Intended Use," the Operating Instructions specified that:

1.2 Intended Use

3

- The cross cutting device is intended and suitable for the transverse cutting of thermoplastic double wall sheets.

...

- Any additional use will be considered inappropriate and at the user's own risk.  The manufacturer will not be liable for any resulting damage.  The user alone bears responsibility for this risk.

- Intended use also excludes any modification of the machine without Breyer's prior consent.

...

- Intended use also includes the observance of these operating instructions and the safety instructions in Part A as well as the compliance with maintenance and repair works.

...

- This stand-alone cross cutting equipment must only be operated by one man.

(Exhibit H, at Section 1-2, "Intended Use," BREYER000028).

15.    The Operating Instructions also warned of the dangers posed by the clamping and blade mechanisms.  It stated:

> 7. There is a danger of being crushed by the clamping beam when the machine is in operation.  Always keep sufficient distance to the danger zones, especially on the intake and delivery side of the cross cutting device.

> 8. Be aware of cutting danger caused by the rotating saw blade or by the knife when the saw unit is in operation.  Never reach into the danger zone beneath the clamping bar.  Make sure that the danger zone is clear before you start a cut.  Maintain an adequate distance from the blades during operation.

(*Id.*, at Section 1-1, "Special Safety Instructions," BREYER000027).

16.    The Operating Instructions also contained instructions for intended use, specifying that "the stand-alone cross cutting device is intended and suitable for the transverse cutting of thermoplastic double wall sheets," and further warning against coming into contact with the "danger zone beneath the clamping bar."  (*Id.*, at Section 4.2, "Description of the Function," BREYER000037).

4

17.     The Operating Instructions also specified that the equipment "must only be operated by one man." (*Id.*, at Section 5, "Commissioning and Operating," BREYER000049).

18.     Finally, Breyer required that the Operating Instructions always "be available at the place of use of the [Machine.]" (Exhibit I, at Section 3.4, "Informal safety measurements," BREYER000082).

### Plaintiff's Employment

19.     Plaintiff starting working at the Facility approximately six or seven weeks prior to the Accident, around late October or November of 2016.  (Witness Statement of Josue Muniz, dated February 15, 2017, OSHA Investigation File, attached as Exhibit J, at p. 1; *see also* Transcript Excerpts Deposition of Josue Muniz, taken August 12, 2020, attached as Exhibit K, at p. 24:14-16).

20.     With respect to training, Plaintiff was shown a safety video by both The Performance Group and his Palram employer.  (Exhibit J, at p. 1; Exhibit K, at pp. 29:22-30:23).

21.     Once employed at the Facility, Plaintiff initially worked peeling film off plastic sheets.  (Exhibit J, at p. 2).  Subsequently he was offered work as a scraper, and offered training on use of the Machine.  (Exhibit J, at p. 2; Exhibit K, at p. 36:12-24).

22.     Plaintiff received instruction on the Machine from a Palram employee named "Frank," who explained to him how the Machine cut the plastic.  Plaintiff did not operate the Machine, but instead "was just grabbing the plastic they was (sic) cutting and put in on the pallet." (Exhibit K, at pp. 37:6-12; 43:5-21).

### The Accident

23.     Prior to the date of the accident, Plaintiff and three other temporary employees— Luis Lopez, Daymar Furse, and Ratang Oong—were tasked with cutting sheets of plastic to be

5

recycled. (Transcript Excerpts Deposition of Daymar Furse, taken March 24, 2021, attached as Exhibit L, at pp. 132:24-133:14; Exhibit J, at p. 2; Exhibit E, at p. 2).

24.     At the time of the accident, Lopez was at the operator's panel on the "inlet side" of the Machine, and Furse, and Oong would spin the roll, which was also situated on the "inlet" side of the Machine, feeding the plastic through the Machine and inserting it under the clamping bar on the Machine.   (Exhibit K, at pp. at 99:1-100:1).

25.     Plaintiff was situated on the other side of the Machine, the "outlet" side, and would grab the plastic and pull it to rest on top of a "stack of pallets" set up next to the machine, lining it up against the pallets. (*Id.*, at pp. 98:1-25; 99:21-101:9; 137:25-138:22).

26.     Furse and Oong would hold the plastic or the roll on the inlet side and Plaintiff would hold the plastic on the outlet side (from either behind or on the stack of pallets on the operator's side). (*Id.* at pp. 99:21-100:10; 101:6-23)

27.     Lopez would then push the cut button on the Machine which would lower the clamping bar onto the plastic.  The blade of the knife, also referred to as the saw in testimony, would then move up into and across the clamping bar to cut the plastic, and once cut, the blade would retract, the clamping bar would raise, and Plaintiff would take the piece and stack it on a pallet. (*Id.*, at pp. 98:4-100:10; 137:25-138:22; *see also* Exhibit J, at p. 3)

28.     At the time of the Accident, after the plastic was inserted under the clamping bar, Plaintiff was standing on the operator's side of the pallet holding onto the side of the plastic piece. (Exhibit K, at pp. 107:5-108:6).

29.     Plaintiff signaled to Lopez to hit the cut start button and the plastic suddenly started to retract back towards the inlet side.  (*Id.*, at pp. 108:4-111:1; *see also* Exhibit J, at p. 5).

30.     Plaintiff testified that he tried to free himself and yelled to Lopez, and observed Lopez repeatedly hitting the "E-stop button" on the control panel with the palm of his hand; however, the Machine did not stop. (*Id.*, at pp. 115:19-118:5).

31.     The knife came across (from the non-operator's side to the operator's side) and he felt his hand go numb. (*Id.*, at p. 118:6-24; 119:15-120:7). The clamping bar then raised. (*Id.*, at p. 120:10-14).

### Modifications to the Machine

32.     At the time of the accident, the multi-functional roller tables had been removed.

33.     After the Accident, the E-stop was found to be functional. (Exhibit D, at p. 92:7-13; *see also* Josue Muniz Injury Report, dated December 27, 2016, Bates-stamped PALRAM 000268-276, attached as Exhibit N, at PALRAM 000276).

34.     Palram conducted an investigation after the Accident, as did the Occupational Safety and Health Administration ("OSHA"). (Transcript Excerpts Deposition of Jeff Follweiler, taken March 22, 2021, attached as Exhibit O, at p. 57:5-7).

Respectfully submitted by:

*Attorneys for Plaintiff Josue Muniz*

THE FERRARA LAW FIRM LLC

By: */s/ Michael A. Ferrara*
   Michael A. Ferrara
601 Longwood Avenue
Cherry Hill, NJ 08002
Tel.:  (877) 655-3425
Fax:  (856) 282-4287
mferrara@ferraralawfirm.com

*Attorneys for Defendant*
*Breyer GmbH Maschinenfabrik*

WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

By: */s/ Michael S. Takacs*
   Michael S. Takacs
2001 Market Street, Suite 3100
Philadelphia, PA 19103
Tel.:  (215) 627-6900
Fax:  (215) 627-2665
michael.takacs@wilsonelser.com

*Attorneys for Plaintiff Josue Muniz*

*Attorneys for Defendant*
*Breyer GmbH Maschinenfabrik*

ROSELLI, GRIEGEL, LOZIER &
LAZZARO, P.C.

WILSON ELSER MOSKOWITZ EDELMAN
& DICKER LLP

By: /s/*Thomas R. Smith*
Thomas R. Smith
1337 Highway 33
Hamilton Square, NJ 08690
Tel.: (609) 586-2257
tsmith@roselligriegel.com

By:/s/ *Frederick W. Reif/Debra A. Tama*
Frederick W. Reif, *admitted pro hac vice*
Debra A. Tama, *admitted pro hac vice*
140 East 42nd Street
New York, NY 10017
Tel.:   (212) 490-3000
Fax:   (212) 490-3038
frederick.reif@wilsonelser.com
debra.tama@wilsonelser.com

8

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOSE MUNIZ,<br><br>        Plaintiff,<br><br>vs.<br><br>STOBER; STÖBER ANTRIEBSTECHNIK GmbH + CO. KG; BREYER Gmbh MASCHINENFABRIK;KLUBER LUBRICATION NA LP; ABC, INC. (I-V); and JOHN DOES (I-V), being fictitious, jointly, individually and in the alternative,<br><br>        Defendants. | Civil Action No. 5:18-cv-04619-JLS |

## <u>BREYER STATEMENT OF MATERIAL FACTS</u>

Defendant Breyer GmbH Maschinenfabrik ("Breyer") submits the following Statement of Material Facts in connection with Breyer's Motion for Summary Judgment directed to Plaintiff's First Amended Complaint filed August 26, 2019 at ECF No. 32 (the "FAC"). Subheadings are for purposes of organization and reference only, and are not statements of fact.

### Procedural History

1.       This litigation arises out of an incident occurring on December 13, 2016, in which Jose Muniz ("Mr. Muniz") alleges he sustained serious personal injuries to his right hand (the "Accident") while using a Breyer cross-cutting machine ("Machine") in the course and scope of his employment (FAC, Exhibit A, ¶¶ 1, 9, 17), while at a facility operated by a Palram entity at 9735 Commerce Circle, Kutztown, Pennsylvania (the "Facility"). Plaintiff's allegations sound in negligence, as well as strict liability under theories of design defect, manufacturing defect, and failure to warn. (*Id.*, Counts I-IV).

1

### The Machine

2.      Breyer designed and manufactured the Machine as a stand-alone product specifically for Suntuf USA in 2002.  (Transcript Excerpts of Deposition of Rolf Preuschoff, taken June 1, 2021, attached as Exhibit C, pp. 10:22-11:7; 13:9-16).  Suntuf USA is currently known as Palram 2000, Inc., and has been dismissed from this action.

3.      The Machine was designed to cut plastic sheets, not plastic rolls or coils.  (*Id.*, pp. 84:16-85:1); (*see particularly*, *id.* at pp. 120:15-121:10, noting "this machine is made for sheets, not full rolls" and 124:3-12, noting the rolled plastic involved in the Accident was "very rigid and stiff" and "cannot be operated by this type of machine").  It was designed to be used by one person. (*Id.* at pp. 75:3-17).

4.      The Machine was designed to operate as follows: the operator would load a sheet, select either a saw blade or knife edge option for the cutting blade, and activate the cutting process through a push button on the main operating desk.  Then, the "clamping beam would move downward and fix the material," holding the sheet during the cutting process, and the selected saw or knife would move upward to the non-operator side of the machine and cut the sheet.  After the sheet is cut, the blade "returns to home position and the clamping beam will open" allowing removal of the cut sheet. (*Id.* at pp. 97:10-98:16; 100:4-14).

5.      The Machine was designed with tables on the feeding and exit sides, four meters by 2.5 meters, to keep persons away from the parts involved in the cutting operation.  (*Id.* at pp. 74:24-75:17).  Additionally, the Machine "is blocked with safety fence all around" and "[t]here are several E stop [emergency stop] buttons[.]"  (*Id.* at pp. 74:24-75:17).

6.    The presence of the tables ensured that operators could not come close to the clamping beam, as the tables would create a distance "mechanically blocking" access. (*Id.* at pp: 104:9-21).

7.    The Machine was intended for use only with those tables, and would not work without them: without the tables, which were screwed in place, the emergency "E-stop" circuit would not close and the machine would not operate.  (*Id.* at pp. 105:25-106:13; 110:22-111:16; 124:20-125:1)

8.    It was not foreseeable to Breyer that the Machine would ever be used without these tables. (*Id.* at pp: 104:9-105:2; 124:13-125:1).

**Machine Operating Instructions**

9.    The Safety Instructions also contained descriptions regarding function, intended use, and warnings.

10.    For example, the Safety Instructions state that:

The [Machine] is built according to the technological development as well as to the acknowledged rules of technical safety.  However, when using the line dangers for body and life of the user or a third person resp. impairment of the machine and other property can arise (sic).   The line is only to be operated

>> For the duly use.  (sic)

>> In perfect condition as it concerns the safety technology.

Failures which could affect the safety have to be eliminated without delay.

(Exhibit I, at Section 1.4, "Dangers upon handling the line," BREYER000078).

11.    The Safety Instructions also further emphasized the Machine's intended use:

- The machine is determined only for the extrusion of the thermoplastics mentioned in the purchase contract.

- Another or moreover use counts for not to be duly. (sic)

3

- BREYER GmbH cannot be held responsible for damages caused by a not intended use of the line.

- The intended use of the line includes also the consideration of the operating instructions as well as the maintenance works.

(*Id.*, at Section 2, "Intended Use," BREYER000079).

12.     The Safety Instructions also contained a limited warranty, and disclaimed liability for improper use of the Machine:

Basically, our "General sales and delivery conditions" which are available to the operator latest since the contract conclusion, are valid.   Warranty and liability claims in case of person and material damages are excluded if they are due to one or several of the following causes

- Not intended (sic) use of the line.

- Improper mouting (sic), starting up, operating and maintaining of the line.

- Operation of the line in case of defective safety devices or not duly mounted or not functioning safety and protective equipments (sic).

- Nonobservance of the instructions in the operating manual concerning the transportation, storing, installation, start-up, operation and maintenance of the line.

- Unauthorized technical modifications on the line.

- Faulty supervision of wearing parts.

- Improperly carried out repairs.

- Catastrophes caused by foreign bodies and force majeure.

(*Id.*, at Section 2.1, "Warranty and liability," BREYER000079).

13.     In addition to these limitations, the Safety Instructions prohibited unilateral modification of the Machine.  (*See id.*, at Section 3.12, "Constructional modifications on the line," BREYER000084, stating that "No modifications, additions or transformations may be carried out on the line without the approval of the manufacturer," further requiring any modifications to be

4

"confirmed in writing by Breyer GmbH," and mandating use of only "original spare and wearing parts")

14.     The Safety Instructions also contained instructions to observe proper use of safety devices:

- Before each start-up of the line, all protective devices have to be mounted properly and be in working order.

- Protective devices may only be removed in case that

    >> The machine has stopped and

    >> The machine is secured from again start-up

- In case of the delivery of partial components, the protective devices have to be mounted duly by the operator.

(*Id.*, at Section 3.3, "Protective devices," BREYER000081); (*see also id.*, at Section 3.7, "Safety measurements during normal operation," BREYER000082, stating "Operate the machine only if all protective devices are in full working order and no faults which affect the safety can be determined").

### Plaintiff's Employment

15.     Plaintiff was employed through The Performance Group, a temporary job placement agency. (Exhibit J, at p. 1; Exhibit K, at p. 23:8-11).  He was hired to work at the Kutztown facility, though it was unclear to him which Palram entity employed him. (Exhibit K, at p. 27:1-19).

16.     Plaintiff did not review the Operating Instructions.  He testified that the instruction manual was available "next to the machine," and was shown to him by "Frank," but he was not instructed to read it and he therefore never reviewed it and "left the book alone." (*Id.*, at pp. 46:22-48:9).

17.     Plaintiff was, however, aware of warnings displayed on the Machine.  For example, he was aware of warnings on the clamping bar and the protective grille near the saw area indicating the danger areas, and understood that they meant the equipment posed risks of crushing injuries or severe cutting injuries.  (*Id.*, at pp. 63:20-67:14).

### The Accident

18.     Plaintiff was still "learning" to use the Machine when the Accident occurred. (Exhibit K, p. 36:25-37:5).

19.     The other three temporary employees had been placed at Palram by different temporary employment agencies.  (*See* Exhibit E, at p. 1, stating Mr. Lopez was hired by "People Share" and Exhibit L, at pp. 10:21-11:1, in which Mr. Furse testified he was placed by Allied Personnel).

20.     In the days leading up to the accident, and on the morning of, these employees reported multiple problems with the Machine to maintenance, including difficulties with the on/off button not working, error messages on the control screen, inability to restart the Machine, and problems with the emergency E-stop buttons. (Exhibit E, at pp. 2-3; Exhibit J, at pp. 3-4; Exhibit K, at pp. 128:11-137:13; 149:25-152:25).

21.     Plaintiff informed his supervisor, John Spell, "about two or three times a week that the machine was not working right." (Exhibit J, at p. 4; Exhibit K, at p. 133:19-24).

22.     The day of the accident, Plaintiff and the other employees were assigned "something new with rolls of plastic," in which large drums or "big rollers" of plastic were brought in by forklift to be cut.  (*See* Exhibit K, at pp. 96:12-97:10; 137:14-24; 153:9-154:23; *see also* Exhibit G, at p. 28:2-5).

23.     Breyer was not aware that such rolls would be used with the Machine (Exhibit C, at pp. 120:24-121:10), which was designed to cut sheets only (*see* Paragraph 3, *supra*).

6

24.     The plastic drums were large, and the plastic appeared to Plaintiff to be about two inches thick. (Exhibit K, at pp. 96:24-97:3).

25.     That day, the tables were not present at the machine, and instead the "stack of pallets" was being used as a makeshift table. (*Id.*, at pp. 60:8-18; 62:22-63:6; 99:21-101:9).

26.     Plaintiff testified that he was caught off guard and his right hand, which was still holding the plastic, was pulled underneath the clamping bar which came down on top of his right hand. (*Id.*, at p. 110:3-19; 111:23-114:3).

### Modifications to the Machine

27.     The presence of these tables would have prevented access to the "danger zone" areas with the clamp and saw or knife. (Exhibit C, at pp. 102:2-24; 124:3-12).

28.     The tables could not easily be removed, and it would require unscrewing the mounting and unplugging the E-stop connection from each table. (*Id.*, at pp. 105:25-107:5).

29.     Instead of the roller tables, one side of the Machine had a stack of pallets and the other side, the roll of plastic for cutting. (*See* Paragraphs 22, 25, *supra*).   A diagram of this configuration at the time of the Accident, Bates-stamped PALRAM 000282 and prepared by Palram employee Robert Levin-Dando following investigation of the accident (*see* Exhibit F, at pp. 90:22-91:13), is attached as Exhibit M.

30.     Removing the tables should have rendered the Machine inoperable entirely (*see* Paragraph 7, *supra*; *see also* Exhibit C, at pp. 106:8-13; 110:22-111:7); therefore, the Machine's circuitry must have been modified or it would not have been able to be used at the time of the accident.

31.     While the E-stop was found to be functional after the Accident, the evidence suggests that during the Accident it did not stop the machine when activated. (Exhibit D, at pp.

91:23-92:13; *see also* Lopez Statement, attached as Exhibit E, Josue Muniz Injury Report, dated December 27, 2016, Bates-stamped PALRAM 000268-276, attached as Exhibit N, at PALRAM 000276).

32.     Investigation led to the discovery that "someone" at Palram had "defeated" the safety features of the Machine (Exhibit O, at pp. 36:12-37:11).

33.     As noted above (Paragraph 7, *supra*), removal of the tables would have created a break in the E-stop circuit, preventing use of the Machine; however, Palram's Maintenance Manager determined that when the tables were removed, at some point a bypass was placed to close the circuit loop and keep the E-stop circuit functioning. (*Id.*, at pp. 177:5-16; 194:9-195:12).

34.     Documents produced by Palram in this action evidence these modifications to the Machine.

35.     Specifically, electrical schematics produced by Palram bear notations that on "10/24/2014" a Palram employee "jumped out pick-up tables from E-stop circuits." (Annotated electrical schematic, bearing date October 14, 2014, Bates-stamped PALRAM000028, attached as Exhibit P). According to Palram's Maintenance Manager, he understood this to mean that there were E-stop circuits on the tables, tables "designed to keep operators away from the machine while it was moving" but "somebody jumped it out." (Exhibit O, at pp. 76:23-77:19). This meant that "instead of the E-stop being in the circuit," the tables and their connection to the E-stop circuit were removed, and someone "put a jumper across [the circuit] to make it think that it was closed," thus allowing the Machine to be operated without the safety tables. (*Id.*, at p. 77:20-24).

36.     Photographs taken after the Accident and produced by Plaintiff in this action also show these changes. (Photographs bearing date-stamp August 31, 2017, attached as Exhibit Q; *see also* Exhibit C, at pp. 124:3-12, testimony of Rolf Preuschoff based on review of photographs

noting the E-stop and electrical parts of the Machine were "modified," with additional switches, connectors, and cables added).

37.    Palram contacted Breyer by e-mail after the Accident, asking if the tables were "optional" and if so, what "do you do with the estop circuit." (E-mail exchange between Jeff Follweiler and Franz Stöckle, dated December 19, 2016, Bates-stamped BREYER000149-151, attached as Exhibit R, at BREYER000150).

38.    Breyer replied that the "machine needs the tables to keep space in front of the machine to avoid accidents" and opined that "the configuration of the machine" would require a "new view on ... safety" because a changed configuration without the tables "will not be a state of the art safety design." (*Id.* at BREYER000149).

39.    Palram "consider[ed] various options" to make the Machine safer, and after communicating with Breyer was informed the "[t]ables should have been in place and would have prevented [the Accident]." (Exhibit O, at p. 91:1-23). "[N]othing was ever agreed upon to operate [the Machine] safely, besides having tables put back in." (*Id.* at p. 91:16-23).

40.    The tables were never found or replaced (Exhibit O, at p. 177:5-19), and ultimately, the Machine was destroyed by Palram in 2020 (*see* JSMF ¶ 12), while this Action was still pending.

Respectfully submitted by:

*Attorneys for Defendant*
*Breyer GmbH Maschinenfabrik*

WILSON ELSER MOSKOWITZ EDELMAN
& DICKER LLP

By: */s/ Michael S. Takacs*
     Michael S. Takacs
2001 Market Street, Suite 3100
Philadelphia, PA 19103
Tel.:   (215) 627-6900
Fax:    (215) 627-2665

9

michael.takacs@wilsonelser.com

-and-

WILSON ELSER MOSKOWITZ EDELMAN
& DICKER LLP

Frederick W. Reif, *admitted pro hac vice*
Debra A. Tama, *admitted pro hac vice*
140 East 42nd Street
New York, NY 10017
Tel.:   (212) 490-3000
Fax:    (212) 490-3038
frederick.reif@wilsonelser.com
debra.tama@wilsonelser.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOSE MUNIZ,<br><br>    Plaintiff,<br><br>vs.<br><br>STOBER; STÖBER ANTRIEBSTECHNIK GmbH + CO. KG; BREYER Gmbh MASCHINENFABRIK; KLUBER LUBRICATION NA LP; ABC, INC. (I-V); and JOHN DOES (I-V), being fictitious, jointly, individually and in the alternative,<br><br>    Defendants. | Civil Action No. 5:18-cv-04619-JLS |

---

**DEFENDANT BREYER GMBH MASCHINENFABRIK'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

---

WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP

Michael S. Takacs
2001 Market Street, Suite 3100
Philadelphia, PA 19103
Tel.:    (215) 627-6900
Fax:    (215) 627-2665
michael.takacs@wilsonelser.com

Frederick W. Reif, *admitted pro hac vice*
Debra A. Tama, *admitted pro hac vice*
140 East 42nd Street
New York, NY 10017
Tel.:    (212) 490-3000
Fax:    (212) 490-3038
frederick.reif@wilsonelser.com
debra.tama@wilsonelser.com

## TABLE OF CONTENTS

| | | Page |
|---|---|---|

I.  SUMMARY ...................................................................................................... 1

II.  EVIDENCE SUBMITTED ................................................................................ 2

III.  STATEMENT OF MATERIAL FACTS ........................................................... 3

IV.  SUMMARY JUDGMENT STANDARD .......................................................... 3

V.  ARGUMENT ...................................................................................................... 5

    A.  Plaintiff Was Improperly Trained and Suffered His Alleged Injuries While Using the Machine in a Manner Contrary to Its Design, Precluding Breyer's Liability ........................................................................................................ 5

        1.  Pennsylvania Law Considers Plaintiff's Conduct as a Defense to Negligence and Strict Products Liability Claims in These Circumstances ............................................................................... 6

        2.  The Undisputed Facts Demonstrate Misuse and Reckless Conduct Regarding the Machine .......................................................................... 7

        3.  This Misuse and Recklessness Precludes Plaintiff from Establishing Causation and Breach of Duty, Requiring Dismissal of His Claims as a Matter of Law .............................................................................. 10

            a.  There Is No Causal Link between Breyer's Alleged Conduct and Plaintiff's Injuries .................................................... 10

            b.  Breyer Owed No Duty of Care in These Circumstances ............... 13

    B.  Palram's Improper Modifications to the Machine Caused Plaintiff's Injuries ...................................................................................................... 14

        1.  Pennsylvania Law Will Not Hold Manufacturer's Liable for Accidents Caused by Substantial and Unforeseeable Changes to Their Products ...................................................................................... 14

        2.  Palram Substantially Modified the Product, Bypassing Key Safety Features ................................................................................................ 15

        3.  Palram's Unforeseen Modifications and Poor Maintenance of the Machine Were the Cause of Plaintiff's Injuries, Not Breyer's Negligence or Any Defect in the Machine ................................................. 16

VI.  CONCLUSION ................................................................................................ 20

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Eagle Outfitters v. Lyle & Scott Ltd.*,
 584 F.3d 575 (3d Cir. 2009) ............................................................4

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986) ........................................................................4

*Baker v. Outboard Marine Corp.*,
 595 F.2d 176 (3d. Cir. 1979) .........................................................13

*Baker v. Solo Nightclub, LLC*,
 2013 U.S. Dist. LEXIS 66084 (E.D.Pa. May 9, 2013)....................14

*Bardaji v. Flexible Flyer Co.*,
 1995 U.S. Dist. LEXIS 13984 (E.D.Pa. Sep't 25, 1995)................13

*Bascelli v. Randy, Inc.*,
 339 Pa. Super. 254, 488 A.2d 1110 (1985) ...................................14

*Battiato v. Harley-Davidson Motor Co.*,
 2010 U.S. Dist. LEXIS 62981 (M.D. Pa. June 24, 2010)...............18

*Burns v. Patino*,
 1999 U.S. Dist. LEXIS 10860 (E.D. Pa. Jul 8, 1999) ...................13

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986) ........................................................................4

*Charlton v. Toyota Indus. Equip.*,
 714 A.2d 1043 (Pa. Super. Ct. 1998)...............................................6

*Childers v. Power Line Equip. Rentals, Inc.*,
 681 A.2d 201 (Pa. Super. Ct. 1996)..................................................6

*Clevenger v. CNH America, LLC*,
 2008 U.S. Dist. LEXIS 45225 (M.D. Pa. June 9, 2008).................7

*Dahlstrom v. Shrum*,
 84 A.2d 289 (1951)...........................................................................7

*Davis v. Berwind Corp.*,
 640 A.2d 1289 (Pa. Super. Ct. 1994)....................................14, 18, 19

*Fisher v. Walsh Parts & Serv. Co.*,
   296 F. Supp. 2d 551 (E.D. Pa. 2003)................................................14, 15, 18

*Flanagan v. MARTFIVE, LLC*,
   259 F. Supp. 3d 316 (W.D.Pa. 2016) ..........................................................11

*Foley v. Pittsburgh-Des Moines Co.*,
   363 Pa. 1 (Pa. 1949)....................................................................................13

*Gaudio v. Ford Motor Co.*,
   976 A.2d 524 (Pa. Super. Ct. 2009)...............................................................6

*Griggs v. BIC Corp.*,
   981 F.2d 1429 (3d Cir. 1992) .......................................................................13

*Hines v. Consol. Rail Corp.*,
   926 F.2d 262 (3d Cir. 1991) ...........................................................................3

*Kaucher v. County of Bucks*,
   455 F.3d 418 (3d Cir. 2006) ...........................................................................4

*Moyer v. United Dominion Industries, Inc.*,
   473 F.3d 532 (3d Cir. 2007) ...........................................................................7

*Murray v. Fairbanks Morse*,
   610 F.2d 149 (3d Cir. 1979) ...........................................................................7

*Pa. Dep't of Gen. Servs. v. U.S. Mineral Prods. Co.*
   587 Pa. 236 (Pa. 2006)................................................................................6, 7

*Pignataro v. Port Auth. of N.Y. & N.J.*,
   593 F.3d 265 (3d Cir. 2010) ...........................................................................4

*Reott v. Asia Trend, Inc.*,
   55 A.3d 1088 (Pa. 2012)..................................................................................6

*Roudabush v. Rondo, Inc.*,
   2017 U.S. Dist. LEXIS 142832 (W.D.Pa. Sep't 5, 2017) .............................19

*U.S. Airways, Inc. v. Elliott Equip. Co., Inc.*,
   2008 U.S. Dist. LEXIS 76105 (E.D. Pa. Sept. 29, 2008) ...............................7

*United States v. 107.9 Acre Parcel of Land in Warren Twp.*,
   898 F.2d 396 (3d Cir. 1990) ...........................................................................4

**Other Authorities**

10A C. Wright, A. Miller, & M. Kane, FEDERAL PRACTICE AND PROCEDURE §
   2725 (1983).....................................................................................................4

Fed. R. Civ. P. 56(c) ..........................................................................................................3

Defendant Breyer GmbH Maschinenfabrik ("Breyer"), by and through the undersigned counsel, hereby files its Motion for Summary Judgment and Brief in Support (the "Motion"), directed to the First Amended Complaint, dated August 26, 2019 (the "FAC"), filed by Plaintiff Josue Muniz ("Plaintiff").

## I.     SUMMARY

The crux of this Motion is simple:  Plaintiff alleges that he suffered injuries on a cross cutting machine designed and manufactured by Breyer, contending that the machine was unreasonably dangerous for its intended use.  Discovery in this matter has revealed a fatal flaw in Plaintiff's claims:  at the time of his accident, the machine was *not* being put to its intended use, and had been substantially modified by his employer, for whom he was working as a temporary employee.

The undisputed facts of the case show that Breyer produced a single-operator machine intended to cut a particular kind of plastic sheets per specifications provided by Plaintiff's employer, and the machine incorporated certain safety features designed to prevent the operator from coming into contact with hazard zones presented by the machine's clamping and cutting apparatuses.  These facts also establish that on the date of the Plaintiff's accident, his employer improperly had multiple persons working on the machine, stationed them in areas contraindicated by the machine's intended use and function, and tasked them with cutting materials for which the machine was not designed.  It is further undisputed that Plaintiff's employer removed key safety features from the machine, and extensively rewired it to activate without them.  Finally, undisputed facts also show that had the machine been put to its intended use and operated with its safety features intact, Plaintiff's accident would not have occurred.

1

Based on these undisputed facts, Breyer is entitled to judgment as a matter of law. The unanticipated misuse of the machine by Plaintiff and his employer break any causal link between Plaintiff's injuries and Breyer's conduct and the machine's design, and further preclude any possibility that Breyer owed Plaintiff a duty of care. (*See* Argument, Part A, *infra*). Additionally, the substantial alterations to the machine by Plaintiff's employer, which disabled and circumvented integral safety features, represent an intervening cause of Plaintiff's injuries for which Breyer is not liable. (*See* Argument, Part B, *infra*). Accordingly, summary judgment must issue in Breyer's favor, and the FAC must be dismissed as against it.

## II.   EVIDENCE SUBMITTED

In support of this Motion, Breyer submits the following documents and testimony as Exhibits to the accompanying Joint Statement of Stipulated Material Facts (the "Stipulated Material Facts" or "JSMF") and to Breyer's Supplemental Statement of Material Facts (the "Breyer Statement of Material Facts" or "BSMF") which are incorporated by reference herein. Relevant exhibits are authenticated by the accompanying Declaration of Rolf Preuschoff, dated March 4, 2022.

| | |
|---|---|
| Exhibit A. | First Amended Complaint filed by Plaintiff on August 26, 2019 |
| Exhibit B. | Answer of Breyer to First Amended Complaint filed on September 20, 2019 |
| Exhibit C. | Transcript Excerpts of Deposition of Rolf Preuschoff, taken June 1, 2021 |
| Exhibit D. | Transcript Excerpts of Deposition of Henry Edward Jennings, taken July 19, 2021 |
| Exhibit E. | Witness Statement of Luis Lopez, undated, OSHA Investigation File |
| Exhibit F. | Transcript Excerpts of Deposition of Robert Levin Dando, taken September 30, 2021 |
| Exhibit G. | Transcript Excerpts of Deposition of Jonathan Spell, taken March 31, 2021 |
| Exhibit H. | Operating Instructions for Cross Cutting Device and Pick Up Table, dated 2002, Bates-stamped BREYER000023-66 |
| Exhibit I. | Suntuf USA Safety Instructions, dated 2002, Bates-stamped BREYER000067-86 |

2

| | |
|---|---|
| Exhibit J. | Witness Statement of Josue Muniz, dated February 15, 2017, OSHA Investigation File |
| Exhibit K. | Transcript Excerpts of Deposition of Josue Muniz, taken August 12, 2020 |
| Exhibit L. | Transcript Excerpts of Deposition of Daymar Furse, taken March 24, 2021 |
| Exhibit M. | Diagram of Machine Configuration, Bates-stamped PALRAM 000282 and prepared by Palram employee Robert Levin-Dando |
| Exhibit N. | Josue Muniz Injury Report, dated December 27, 2016, Bates-stamped PALRAM 000268-276 prepared by Palram employee Robert Levin-Dando |
| Exhibit O. | Transcript Excerpts of Deposition of Jeff Follweiler, taken March 22, 2021 |
| Exhibit P. | Annotated electrical schematic, bearing date October 14, 2014, Bates-stamped PALRAM000028 |
| Exhibit Q. | Photographs bearing date-stamp August 31, 2017 |
| Exhibit R. | E-mail exchange between Jeff Follweiler and Franz Stöckle, dated December 19, 2016, Bates-stamped BREYER000149-151 |

## III.   STATEMENT OF MATERIAL FACTS

Per this Court's Individual Policies and Procedures, the parties hereby submit a Joint Statement of Stipulated Material Facts contemporaneously with this Motion, which consists of the facts upon which the parties agree. Additionally, Breyer submits a supplemental Statement of Material Facts to which Plaintiff objects, but to which Breyer contends there is no material dispute under the evidence. Breyer incorporates herein both Statements as if set forth at length. All capitalized terms used but not defined herein shall have the meaning ascribed to them in the Joint Statement of Stipulated Material Facts and the Breyer Statement of Material Facts.

## IV.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Hines v. Consol. Rail Corp.*, 926 F.2d 262, 267 (3d Cir. 1991).

The moving party bears initial responsibility to inform the court of the basis for its motion, and to identify the aspects of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party makes this initial showing, the burden shifts to the non-moving party to demonstrate that there is in fact a genuine issue of material fact. *United States v. 107.9 Acre Parcel of Land in Warren Twp.*, 898 F.2d 396, 398 (3d Cir. 1990). The non-moving party, in meeting its burden, is entitled to all reasonable inferences in its favor. *Pignataro v. Port Auth. of N.Y. & N.J.*, 593 F.3d 265, 268 (3d Cir. 2010). Ultimately, the non-moving party must present sufficient evidence from which a reasonable jury could return a verdict in the non-moving party's favor. *Id.*

Critically, a "motion for summary judgment will not be defeated by 'the mere *existence*' of some disputed facts, but will be denied when there is a *genuine issue* of material fact." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)) (emphasis added). An issue is genuine "only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment … [f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248 (citing 10A C. Wright, A. Miller, & M. Kane, FEDERAL PRACTICE AND PROCEDURE § 2725, pp. 93-95 (1983)).

Here, Breyer has met its initial burden, as set forth below, and Plaintiff cannot present a genuine issue of material fact, warranting entry of summary judgment in this action on Plaintiff's claims against Breyer.

4

## V.     ARGUMENT

Plaintiff asserts claims of negligence against Breyer (FAC, Exh. A, Count I), as well as claims of strict liability based on theories of defective design, manufacturing defect, and failure to warn (*Id.*, Counts II-IV).  However, the evidence and testimony in this case conclusively establish that Plaintiff's alleged injuries did not occur through any negligence of Breyer, or any defect in the Machine's design, manufacture, or warnings.

*First*, undisputed and indisputable facts show that at the time of the Accident, Plaintiff was not properly trained in the use of the Machine, and was engaged in a clear misuse of the product contraindicated by its specifications, intended functions, and operational instructions.   This improper use of the Machine precludes Plaintiff as a matter of law from establishing his negligence and strict products liability claims.  Plaintiff cannot claim the product was unsafe for an intended use that he never undertook.

*Second*, Plaintiff's claims further fail because the undisputed facts demonstrate that the Machine was modified by Palram after it left Breyer's control, with key safety features—which would have prevented the accident entirely—removed and bypassed without Breyer's knowledge and in an unforeseeable manner.  This substantial modification of the Machine after its sale defeats any claim of negligence or strict products liability as a matter of law.

### A.     Plaintiff Was Improperly Trained and Suffered His Alleged Injuries While Using the Machine in a Manner Contrary to Its Design, Precluding Breyer's Liability

Plaintiff's claims rest on the premise that Breyer failed to exercise due care when, and is otherwise strictly liable for, designing and manufacturing a product that was unreasonably dangerous when "used as designed and ... for its intended purpose" or in a "reasonably foreseeable manner." (*See* FAC, Exh. A, ¶¶ 21-22; *see also id.*, at ¶¶ 29-30, 34-35, 40).  However, the facts in the record conclusively show that Plaintiff was not an intended user of the Machine, was not using

the Machine for its intended use, and was not using the Machine in the manner for which it was designed or in any foreseeable manner.   Under applicable law, these undisputed facts compel summary dismissal of his negligence and strict products liability claims.

### 1.   Pennsylvania Law Considers Plaintiff's Conduct as a Defense to Negligence and Strict Products Liability Claims in These Circumstances

Pennsylvania law provides that "a manufacturer can be deemed liable only for harm that occurs in connection with a product's *intended use* by an *intended user*[.]"   *Pa. Dep't of Gen. Servs. v. U.S. Mineral Prods. Co.* 587 Pa. 236, 253 (Pa. 2006)) (emphasis added).   A plaintiff's misuse may be raised by a defendant to rebut claims of both negligence and strict products liability, for both as a matter of the required element of causation and also for negligence as a matter of the element of duty.

With respect to negligence, defendants may introduce "evidence of a plaintiff's voluntary assumption of the risk, misuse of a product, or highly reckless conduct" in order to break the "element of causation" required under negligence claims.   *Charlton v. Toyota Indus. Equip.*, 714 A.2d 1043, 1047 (Pa. Super. Ct. 1998); *accord Gaudio v. Ford Motor Co.*, 976 A.2d 524, 540-41 (Pa. Super. Ct. 2009).   To establish voluntary assumption of the risk, a defendant must show that the plaintiff "knew of a defect and yet voluntarily and unreasonably proceeded to use the product." *Gaudio*, 976 A.2d at 541; *see also Childers v. Power Line Equip. Rentals, Inc.*, 681 A.2d 201, 208 (Pa. Super. Ct. 1996) ("[a]ssumption of risk involves the meeting of a subjectively known risk") (citations omitted).   To establish misuse, a defendant must show that the use was "unforeseeable or outrageous." *Childers*, 681 A.2d at 208.   Next, "[h]ighly reckless conduct is akin to evidence of misuse and requires the defendant to prove that the use was so extraordinary and unforeseeable as to constitute a superseding cause." *Reott v. Asia Trend, Inc.*, 55 A.3d 1088, 1096 (Pa. 2012) (quoting *Gaudio*, 976 A.2d at 541).   Additionally, a plaintiff's unanticipated misuse of a product

6

may be used to show a defendant owed no duty of care under the circumstances. Under Pennsylvania law, "the test of negligence is whether the wrongdoer could have anticipated and foreseen the likelihood of harm to the injured person ... the risk reasonably to be perceived defines the duty to be obeyed[.]" *Dahlstrom v. Shrum*, 84 A.2d 289, 290-91 (1951). Where the plaintiff's use of the product was unanticipated and unforeseeable, the defendant owes no duty of care. *Id.*

Next, regarding strict liability, "[u]nder Pennsylvania law, evidence of misuse is generally admissible to defeat causation in a strict liability design defect case." *Moyer v. United Dominion Industries, Inc.*, 473 F.3d 532, 542 (3d Cir. 2007) (collecting and citing cases); *accord Murray v. Fairbanks Morse*, 610 F.2d 149, 155 (3d Cir. 1979) ("product misuse unforeseeable to the defendant is also an absolute defense to a strict products liability action"). Crucially—unlike with negligence which considers the foreseeability of Plaintiff's conduct—misuse provides a defense in strict products liability even where the misuse was "foreseeable by a manufacturer." *U.S. Mineral Prods*. Co. 587 Pa. at 253; *accord U.S. Airways, Inc. v. Elliott Equip, Co., Inc.*, 2008 U.S. Dist. LEXIS 76105 (E.D. Pa. Sept. 29, 2008) ("[n]o strict liability exists for non-intended uses even if foreseeable"); and *Clevenger v. CNH America, LLC*, 2008 U.S. Dist. LEXIS 45225 (M.D. Pa. June 9, 2008) (a product's intended use is not any foreseeable use, but rather manufacturer's actual, intended use of product).

Application of these principles and precedents to the undisputed facts demonstrate that summary judgment is warranted here.

### 2. The Undisputed Facts Demonstrate Misuse and Reckless Conduct Regarding the Machine

The record establishes that the Machine was a custom-made, one-of-a-kind piece of equipment built to specifications provided by Paltough/Palram. (JSMF, ¶ 7). It was specifically designed to cut sheets of multiwall plastic (JSMF ¶ 14; BSMF, ¶¶ 2-3), and to be operated by a

single person from the control desk on the inlet, loading side of the machine (JSMF ¶ 14, 17; BSMF ¶ 4).  The Machine's Operating Instructions and Safety Instructions emphasized these intended uses and operations.  (*See* JSMF ¶¶ 14, 16) (quoting Sections 1.2 and 4.2, "Intended Use" and "Description of the Function," which state that the machine is "intended and suitable" for "cutting … thermoplastic double wall sheets"); (*see also* JSMF, ¶ 17) (the Operating Instructions specified that the Machine "*must only* be operated by *one man*").  The Safety Instructions further admonished the user to observe due use of the Machine and comply with its operating instructions.  (JSMF ¶ 14; BSMF ¶ 10).  They also warned users to stay well away from the "danger zones" of the device—particularly the areas beneath the clamping bar and around the "rotating saw blade" and knife. (JSMF ¶ 15)  Additionally, the Machine was intended for use with roller tables mounted to the Machine and wired into its "Emergency stop" circuitry, safety measures designed to block physical access to the dangerous clamping and saw/blade assemblies. (BSMF, ¶¶ 6-7, 27).

The record is equally clear that neither the intended use of the Machine nor the intended manner of its operation were observed the day of the Accident.  It is undisputed that rather than cutting the wall sheets the Machine was intended for, Plaintiff and his fellow employees were instructed by Palram to do "something new with rolls of plastic," tasked with cutting thick rolls of plastic that were coiled around large drums to prepare the plastic for scrap recycling.  (JSMF, ¶ 23; BSMF ¶ 22-24).  Such a use was not known or foreseeable to Breyer, who had designed the product for a particular purpose per Paltough/Palram's specifications.  (BSMF, ¶¶ 3, 23).  Furthermore, the safety tables were not present: instead Palram employees used a "stack of pallets" as a makeshift table.  (BSMF, ¶ 25).  Plaintiff, additionally, was clearly within an arm's length of the Machine's "danger zones" which enabled his right hand to become trapped. (JSMF ¶ 28, BSMF, ¶ 26).  Also, more than one man was using the Machine:  in addition to operator Luis

Lopez, Plaintiff and two other temporary employees were stationed around the Machine at different points. (JSMF, ¶¶ 23-25). Lopez stood at the operator controls on the inlet side while two others—Daymar Furse and Ratang Oong, also on the inlet, feeder side—spun the plastic rolls to feed plastic through the machine where Plaintiff—standing on the other, "outlet" side—would grab the plastic and pull it across to rest on top of a stack of pallets. (*Id.*, ¶¶ 24-26). Had Plaintiff been the only operator, there is no possible way that the injury could have occurred.

Critically, at the time of the Accident, Plaintiff was working with the Machine without proper training or knowledge of its use. Plaintiff was still "learning" to use the Machine by his own admission (BSMF, ¶ 18), and he had received no real training. After being placed at Palram by a temporary employment agency, Plaintiff only watched a pair of general safety videos. (JSMF, ¶¶ 19-20). Subsequently, after he was given a position as a scraper, Palram provided only limited, incorrect instruction regarding the Machine. (*Id.*, ¶ 21). Plaintiff was instructed by a Palram employee who explained to him how the Machine cut plastic. (*Id.*, ¶ 22). Instead of being shown how to operate the Machine properly, Plaintiff was tasked with "just grabbing the plastic they was [sic] cutting and putting it on the pallet." (*Id.* ¶ 22). For his own part, Plaintiff failed to review the Operating Instructions for the Machine, even though he knew of their existence. He understood the instruction manual was available next to the Machine, and it was shown to him by his Palram instructor, but because he was not specifically told to read it, he never reviewed it and "left it alone." (BSMF, ¶ 16). Plaintiff elected to ignore the manual despite awareness of warnings plastered on the Machine alerting him to the dangers posed by the clamping bar and saw/blade areas, which he understood as warning against risks of crushing injuries and severe cutting injuries. (*Id.* ¶ 17).

9

3. **This Misuse and Recklessness Precludes Plaintiff from Establishing Causation and Breach of Duty, Requiring Dismissal of His Claims as a Matter of Law**

The foregoing undisputed facts break the chain of causation on Plaintiff's strict products liability and negligence claims, and preclude any assertion in negligence of a duty owed by Breyer, warranting dismissal as a matter of law.

a. **There Is No Causal Link between Breyer's Alleged Conduct and Plaintiff's Injuries**

The Accident occurred solely due to the fact the Machine was not being used properly through the fault of Plaintiff and Palram, which is demonstrated by the following causal analysis:

*First*, had the Machine been used as designed and intended to cut plastic sheets, rather than plastic from rolls, the accident could not have happened. Plaintiff alleges that the plastic material, which had been unspooled from a coiled roll, began to retract and pull him toward the clamping bar. (JSMF, ¶¶ 24-25, 29; BSMF ¶ 26). If the Machine had been cutting flat separate sheets as intended, rather than plastic pulled taut from a coiled roll, the Accident would not have happened as the plastic would not have retracted back toward the roll.

*Second*, had only a single person been operating the Machine from the control desk on the inlet side, as Breyer intended and instructed in the Operating Instructions, the Accident could not have happened: there would have been no one on the feeder side at risk of being drawn toward the clamping bar and blade/saw danger zones. Had the Machine been put to its intended use, Plaintiff never would have been there in the first place.

*Third*, had the roller tables been mounted to the Machine and used as Breyer designed and intended, the Accident could not have happened. Their removal caused the Accident to happen, and the modifications necessary to accomplish their removal further break the causal chain as against Breyer (*see* Argument, Part B, *infra*). The tables were mounted on both the inlet and outlet

10

sides, and measured 4 meters by 2.5 meters, a measure intended to keep persons away from the moving parts involved in the cutting functions and to block physical access to the danger zones. (BSMF, ¶¶ 5-6). Had the tables been present, Plaintiff would have been physically blocked from being drawn within reach of the clamping bar and blades, and the Accident would not have occurred.

*Fourth*, Plaintiff was within reach of the "danger zones" of the machine, the area underneath the clamping bar in the path of the saw/knife tools. The Operating Instructions contained clear admonishments to stay well away from these areas while the Machine was in operation. (JSMF, ¶ 15). Had Plaintiff observed proper distance, the Accident would not have happened.

Consequently, there is no causal link running between Breyer's alleged fault in designing and manufacturing the machine and Plaintiff's injuries, precluding causation on either a theory of negligence or strict products liability. Plaintiff was in a position and performing a task contraindicated by the Machine's design, features, and intended use, all through no fault of Breyer's. Rather, it was the actions of Plaintiff and Palram that placed him there. Plaintiff failed to read the Operating Instructions for the Machine, even though they were available to him, right next to the Machine, and despite the fact that he recognized the danger the Machine posed in terms of its risks of severe crushing and cutting injuries if misused. (BSMF, ¶¶ 16-17).[1] Plaintiff

---

[1] This undisputed fact is alone sufficient to dismiss Plaintiff's failure to warn claim, set forth at Count IV of the FAC. The Operating Instructions and Safety Instructions were replete with information that the Machine should only be operated by one person and only be used to cut multiwall plastic sheets, and contained warnings concerning the danger of the clamping bar and cutting assembly. (JSMF, ¶¶ 13-18; BSMF ¶¶ 9-14). Plaintiff cannot sustain a claim that additional warnings were needed when it is undisputed that he failed to heed the existing warnings. *See Flanagan v. MARTFIVE, LLC*, 259 F. Supp. 3d 316 (W.D.Pa. 2016) (dismissing failure to

recognized that he was working with a dangerous piece of machinery, but proceeded to work without making any effort to familiarize himself with its proper and intended use. Additional blame lies with Palram and the employees supervising Plaintiff, who (1) never instructed him in the Machine's proper use, (2) did not direct him to review the operation and safety instructions, and (3) assigned him to a multi-person task cutting unsuitable plastics contraindicated by the Machine's design, operating functions, and purpose. (JSMF, ¶¶ 14, 21-22, BSMF ¶¶ 16, 22). Had Palram properly trained Plaintiff and tasked him with operations consistent with the Machine's intended use, the Accident would never have happened.

Plaintiff and Palram therefore clearly misused the Machine, using it in a manner that was dangerous, unanticipated, and clearly not foreseeable to Breyer who produced the Machine custom-made to specifications provided by Paltough/Palram, designing it to cut multiwall thermoplastic sheets through operations controlled by a single person, one standing on the inlet side and away from the "danger zones." (JSMF, ¶¶ 7, 14-17; BSMF ¶¶ 3, 5-6, 11). Breyer also produced the Machine with safety measures built in, such as the tables, devices without which it would ordinarily not activate or operate. (BSMF, ¶ 7). It could not be foreseen that Palram employees would do the exact *opposite* with the Machine: cutting thicker, unsuitable plastics from coiled rolls, with multiple persons stationed around the Machine, working on the outlet side within reach of the danger zones, and with safety measures like the tables removed.

Ultimately, because Plaintiff was misusing the Machine and using it in an unanticipated, reckless manner, Plaintiff cannot point to any facts even suggesting the Machine is unsafe when used properly. Therefore, dismissal of his strict products liability and negligence claims is proper

---

warn claim on summary judgment where Plaintiff admitted he did not read materials accompanying the allegedly defective product).

at this summary judgment stage. Strict products liability claims fail when plaintiffs cannot show that the product is unsafe for its intended use, and assert contentions only regarding unintended uses, even if foreseeable. *Griggs v. BIC Corp.*, 981 F.2d 1429 (3d Cir. 1992). His negligence claims must also fail due to his clear misuse. *Bardaji v. Flexible Flyer Co.*, 1995 U.S. Dist. LEXIS 13984 (E.D.Pa. Sep't 25, 1995) (summary judgment entered where plaintiff could provide no evidence of causation negating her own abuse and mishandling of the product). Additionally, Palram's negligence in training Plaintiff and directing Plaintiff's work—negligence of a third party beyond Breyer's knowledge or control—further argues for summary judgment. *Baker v. Outboard Marine Corp.*, 595 F.2d 176, 183 (3d. Cir. 1979) (intervening negligence of a third party is a superseding cause of a plaintiff's injuries where not reasonably foreseeable to the manufacturer); *Burns v. Patino*, 1999 U.S. Dist. LEXIS 10860 (E.D. Pa. Jul 8, 1999) (granting summary judgment, finding intervening negligence can be determined as a matter of law where undisputed facts show occurrence was unforeseeable)

### b.   Breyer Owed No Duty of Care in These Circumstances

Plaintiff's unanticipated and dangerous misuse of the product also precludes finding any duty sufficient to anchor his negligence claim, further warranting dismissal of that Count. It is long-settled that a manufacturer's duty of care extends to the *foreseeable* risks of a chattel. *Foley v. Pittsburgh-Des Moines Co.*, 363 Pa. 1, 26-27 (Pa. 1949). Here, the unanticipated use Plaintiff and Palram made of the Machine is simply not foreseeable. As noted, the day of the Accident, the Machine was used in a manner that not only deviated from its intended use and functions, but also in a manner that was the exact *opposite* of its intended use. It was simply not foreseeable to Breyer that Palram—after specifically asking for and receiving a custom-made single-operator product to cut multiwall plastic sheets—would take that product, disable and bypass key safety features, and task multiple personnel with using it to cut unsuitable materials. Breyer was under no duty to

13

protect Plaintiff from the unforeseen conduct of third-parties over whom it had no control. *Baker v. Solo Nightclub, LLC*, 2013 U.S. Dist. LEXIS 66084 (E.D.Pa. May 9, 2013).

**B.      Palram's Improper Modifications to the Machine Caused Plaintiff's Injuries**

Apart from Plaintiff and Palram's misuse of the product, Palram's modifications of the Machine represents a separate intervening cause of the Accident which breaks the chain of causation and compels dismissal of Plaintiff's claims.

**1.      Pennsylvania Law Will Not Hold Manufacturer's Liable for Accidents Caused by Substantial and Unforeseeable Changes to Their Products**

Under Pennsylvania law, "a manufacturer or seller is not liable for injuries caused by a defective product if the defect was created by a substantial alteration in the product amounting to a supervening or intervening cause of the plaintiff's injuries." *Davis v. Berwind Corp.*, 640 A.2d 1289, 1297 (Pa. Super. Ct. 1994). Such an alteration, a "material change" to a product after it leaves the manufacturer's control, will break the chain of causation if "the plaintiff would not have been injured had the product remained in its unaltered state." *Fisher v. Walsh Parts & Serv. Co.*, 296 F. Supp. 2d 551, 563 (E.D. Pa. 2003) (citing *Davis*, 640 A.2d at 1297). "Where the product has reached the user … with substantial change, the question then becomes whether the manufacturer could have reasonably expected or foreseen such an alteration of its product." *Davis*, 640 A.2d at 1297 (*citing Bascelli v. Randy, Inc.*, 339 Pa. Super. 254, 488 A.2d 1110 (1985)). While foreseeability is generally a question for a factfinder, judgment as a matter of law is appropriate where "the inferences are so clear that a court can say as a matter of law that a reasonable manufacturer could not have foreseen the change." *Id.*

Thus, a manufacturer may be relieved of liability if "(1) the product was substantially altered after it left the manufacturer's control; (2) the modifications were not foreseeable to the manufacturer; and (3) the changes to the product were a superseding cause of the user's injury."

*Fisher*, 296 F. Supp. 2d at 563.  A manufacturer is simply not liable where a safe product is made unsafe by subsequent and unforeseeable changes. *Id.* (citation omitted).

> **2.    Palram Substantially Modified the Product, Bypassing Key Safety Features**

It is undisputed that as of the day of the Accident, the Machine had undergone substantial alterations at the hands of Palram.

As described above, the Machine was particularly designed with mounted roller tables on the inlet and outlet sides, which were wired into the E-stop circuitry and—at four meters by 2.5 meters—prevented physical access to the "danger zones" of the clamping bar and saw/knife assembly.  (BSMF, ¶¶ 5-7, 27).  Removing the tables was not a simple matter, as it required unscrewing the mountings and disconnecting the tables from the E-stop circuit.  (BSMF, ¶ 28). Under normal circumstances, the Machine would not even work without them, as removing them would mean the E-stop circuit would not close and the Machine would not activate.  (BSMF, ¶ 7). However, on the date of the Accident, the tables were nowhere to be seen, and instead a "stack of pallets" was used as a makeshift table.  (BSMF, ¶ 25).

Removing the tables should have prevented the Machine from even activating (BSMF, ¶¶ 7, 30), but subsequent investigation revealed that someone at Palram had "defeated" this safety feature (BSMF, ¶ 32).  Palram's Maintenance Manager, Jeff Follweiler, determined that when the tables were removed, someone at Palram had placed a bypass in the circuitry to close the circuit loop and keep the E-stop circuit functioning.  (BSMF, ¶ 33). Electrical schematics in Palram's possession, bearing the date notation "10/24/2014," recorded that someone "jumped out pick-up tables from E-stop circuits."  (BSMF, ¶ 35).  Follweiler understood this to mean that while there were E-stop circuits on the tables, "somebody jumped it out," meaning that "instead of the E-stop being in the circuit," the tables and their connection to the E-stop circuit were removed, and

someone "put a jumper across [the circuit] to make it think that it was closed." (*Id.*)  Photographs

taken of the Machine after the accident and produced by Plaintiff corroborate these changes, which

show additional switches, connectors, and cables added to the E-stop and electrical parts of the

Machine. (BSMF, ¶ 36).

Tellingly, Palram—having never done so before—contacted Breyer after the Accident to

inquire whether the Machine could have been operated properly without the tables. (*See* BSMF,

¶ 37) (Follweiler inquired to Breyer whether the tables were "optional" and if so, what to "do with

the estop circuit").   Unfortunately for Palram, Breyer replied in no uncertain terms that the

"machine needs the tables to keep space in front of the machine to avoid accidents" and opined

that "the configuration of the machine" would require a "new view on … safety" because a

changed configuration without the tables "will not be a state of the art safety design." (BSMF, ¶

38).  Palram "consider[ed] various options" to make the Machine safer after the Accident, and

after communicating with Breyer was informed the "[t]ables should have been in place and would

have prevented [the Accident]." (BSMF, ¶ 39).  Palram's Maintenance Manager noted "nothing

was ever agreed upon to operate [the Machine] safely, besides having tables put back in," and

ultimately those tables were never found or replaced, and the Machine was destroyed by Palram

in 2020 during the pendency of this action. (BSMF, ¶¶ 39-40)

### 3.   Palram's Unforeseen Modifications and Poor Maintenance of the Machine Were the Cause of Plaintiff's Injuries, Not Breyer's Negligence or Any Defect in the Machine

Palram's modifications absolve Breyer of any potential liability.  Breyer did not know or

foresee that Palram would alter the product in such a manner, and could not have reasonably

foresee such changes. (BSMF, ¶ 8).

Breyer designed the product expressly for use with the tables, which were mounted on the

Machine and wired into the E-stop circuitry, and particularly designed to prevent individuals from

16

coming into contact with the Machine's danger zones—a fact which even Palram admits. (*See*, BSMF, ¶ 35) (Follweiler testimony admitting the tables were "designed to keep operators away from the machine while it was moving"). Breyer also provided operating and safety instructions emphasizing that the Machine should only be put to its proper use, with its safety features "[i]n perfect condition" and properly mounted, functioning, and in working order. (BSMF, ¶¶ 9-12, 14). Breyer's instructional materials also warned against modifications of the Machine undertaken without Breyer's knowledge or approval, including modifications made with non-Breyer parts. (BSMF, ¶ 13).

There is no dispute that the Machine was modified to remove and bypass these features, as described at length above. There is also no dispute that Breyer never learned of Palram's unilateral modifications until after the Accident, and it certainly never approved of them. Indeed, in the immediate aftermath of the Accident, Palram did not actually inform Breyer of the modifications even then, but instead first contacted Breyer to inquire hypothetically whether the tables could have been be removed as "optional" and the E-stop changed. (*See* BSMF, ¶ 37). Without even knowing the accident had occurred, Breyer promptly replied that they were necessary safety features and any such change would render the Machine less safe. (BSMF, ¶ 38).

Nor could Breyer have foreseen such a possibility as Palram removing the tables and modifying the E-stop mechanism. Breyer could not have reasonably foreseen that Palram would remove the tables—a key safety feature mounted and wired into the Machine, without which the Machine would not work—and then extensively rewire the system to compensate. Moreover, Breyer could not have foreseen that Palram, after modifying the product to remove the tables, would resort to using further makeshift additions like placing a stack of pallets on the feeder side to replace them—an addition that placed Plaintiff in the zone of danger. Finally, Breyer could not

17

have reasonably foreseen that Palram would continue to use the Machine even when indications arose that their modifications were causing problems. As reflected in testimony by Plaintiff and statements by his fellow employees, there were numerous problems with the Machine prior to the Accident, with numerous issues with the Machine's controls and E-stop button appearing and Plaintiff informing his supervisor "about two or three times a week that the machine was not working right." (BSMF, ¶¶ 20-21). Indeed, the evidence suggests that during the Accident, the E-stop did not stop the machine when activated although afterwards it was found to be functioning. (JSMF, ¶¶ 30, 33; BSMF ¶ 31).

Such modifications to integral safety features place fault squarely with Palram and were unforeseeable to Breyer, precluding any causal link between Plaintiff's injuries and Breyer's conduct or design of the Machine as a matter of law. Case law is clear that such removal of integral safety devices is not foreseeable to a manufacturer and represents an intervening cause. *Davis*, 640 A.2d at 1296-1299 (overturning jury decision in plaintiff's favor where plaintiff had disabled an interlocking safety device on a meat blender which was "integral" to the product's design *even though* it could function without it); *see also Battiato v. Harley-Davidson Motor Co.*, 2010 U.S. Dist. LEXIS 62981, at *15-16 (M.D. Pa. June 24, 2010) (substantial alteration defense applies "where [another party] acted to change the way a device operated or to remove safety controls"). Moreover, where a party makes alterations to a product and removes safety features, without contacting the manufacturer and using their own parts and resources, fault will not lie with the manufacturer. *Fisher*, 296 F. Supp. 2d at 551, 564-566 (granting judgment on strict product liability claims of a plaintiff who lost part of her hand due a mechanical press, noting her employer made a series of modifications that removed safety features, using parts they fabricated without consulting the manufacturer). This is particularly true where another party not only removes safety

features, but further modifies the product to operate without them. *See also Roudabush v. Rondo, Inc.*, 2017 U.S. Dist. LEXIS 142832 (W.D.Pa. Sep't 5, 2017) (no liability on manufacturer's part where a filling depositer machine was designed with safety features meant to prevent an operator's fingers from coming into contact with its piston assembly; however, the plaintiff's employer after delivery removed the safety guards and "re-wired" the machine to "circumvent" the safety measures" and the court found the accident could not have occurred but for these modifications).

Ultimately, there is no dispute that when the product left Breyer's control, it incorporated tables mounted to the Machine that were wired into the E-stop circuitry and designed to prevent access to hazard areas, and materials accompanying the Machine emphasized the requirement to use the Machine only with its safety features in working order. There is also no dispute that Palram removed these features, and rewired the Machine to operate without them. Palram's modifications represent an intervening cause of Plaintiff's injuries and broke the chain of causation as a matter of law, a not uncommon phenomenon in product liability cases. *See Davis*, 640 A.2d at 1299 (examining case law in which employer modification to equipment absolved manufacturers of liability for injuries subsequently suffered by employee plaintiffs, noting that "in many workplace injuries it is the employer, not the manufacturer, that is the culpable party"). Palram's unforeseen removal of the Machine's safety features and modification of its functions to compensate proximately caused the Accident, not Breyer's conduct or the Machine's design. Had the tables been present, and the Machine not rewired to work without them, the Accident could not have taken place, as even Palram admits. (BSMF, ¶ 39) (admitting the "[t]ables should have been in place and would have prevented [the Accident]"). Thus, summary judgment must issue.

## VI.    CONCLUSION

For the foregoing reasons, Defendant Breyer GmbH Maschinenfabrik respectfully requests

that this Honorable Court grant summary judgment in its favor and dismiss the claims directed

against it in the First Amended Complaint.

Dated: March 29, 2022                    Respectfully submitted,

                                         WILSON ELSER MOSKOWITZ
                                         EDELMAN & DICKER LLP

                                         By:/s/ Michael S. Takacs
                                             Michael S. Takacs
                                         2001 Market Street, Suite 3100
                                         Philadelphia, PA 19103
                                         Tel.:   (215) 627-6900
                                         Fax:    (215) 627-2665
                                         michael.takacs@wilsonelser.com

                                         Frederick W. Reif, *admitted pro hac vice*
                                         Debra A. Tama, *admitted pro hac vice*
                                         140 East 42nd Street
                                         New York, NY 10017
                                         Tel.:   (212) 490-3000
                                         Fax:    (212) 490-3038
                                         frederick.reif@wilsonelser.com
                                         debra.tama@wilsonelser.com

                                         *Attorneys for Defendant*
                                         *Breyer GmbH Maschinenfabrik*

## CERTIFICATE OF SERVICE

I, Michael Takacs, attorney for the defendant, Breyer GmbH Maschinenfabrik, hereby certifies that on the 29th day of March, 2022, a true copy of the foregoing Defendant Breyer GmbH Maschinenfabrik's Motion for Summary Judgment and Brief in Support was filed through the ECF system and sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be served via first-class mail, postage prepaid, upon anyone indicated as a non-registered participant.

*/s/ Michael S. Takacs*
Michael S. Takacs, Esquire

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOSE MUNIZ, | Civil Action No. 5:18-cv-04619-JLS |
| Plaintiff, | |
| vs. | |
| STOBER; STÖBER ANTRIEBSTECHNIK GmbH + CO. KG; BREYER Gmbh MASCHINENFABRIK; KLUBER LUBRICATION NA LP; PALRAM AMERICAS; ABC, INC. (I-V); and JOHN DOES (I-V), being fictitious, jointly, individually and in the alternative, | |
| Defendants. | |

**DECLARATION OF ROLF PREUSCHOFF**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

I, Rolf Preuschoff, pursuant to 28 U.S.C.§ 1746, declare:

1.       I am employed as Director, Supply Chain Management, for Defendant Breyer

Maschinenfabrik GmbH ("Breyer"), and have held this position since 01. January 2016.  In my

capacity as Director, Supply Chain Management, I am fully familiar with the facts set forth herein,

based on my personal knowledge, research of company documents, and discussions with company

employees.

2.       I submit this Declaration in support of Breyer's Motion for Summary Judgment

directed against the First Amended Complaint filed by Plaintiff Josue Muniz, in order to

authenticate documents submitted in connection with the Motion.

3.       In the regular course and scope of its business, Breyer generates operational and

safety instructions and manuals for products it designs and manufactures for customers.

1



4.     Breyer designed and manufactured a custom "Cross cutting device and pick up table," product No. 28874, for Suntuf USA, which is the subject of this action.  In the regular course and scope of its business, Breyer prepared operating instructions and safety instructions for this product.

5.     A true and correct copy of the "Operating Instructions for Cross Cutting Device and Pick Up Table," dated 2002, Bates-stamped BREYER000023-66, is attached to the Concise Statement of Material Facts accompanying the Motion as Exhibit H.

6.     A true and correct copy of "Suntuf USA Safety Instructions," dated 2002, Bates-stamped BREYER000067-86, is attached to the Concise Statement of Material Facts accompanying the Motion as Exhibit I.

7.     Additionally, in the regular course and scope of its business, Breyer communicates with customers via electronic mail, including with personnel for the Palram entities involved in this action.

8.     E-mail communications are stored and maintained in the regular course of business, and relevant communications were produced in this action.

9.     A true and correct copy of an e-mail exchange between Jeff Follweiler of Palram and Franz Stöckle of Breyer, dated December 19, 2016, Bates-stamped BREYER000149-151, is attached to the Concise Statement of Material Facts accompanying the Motion as Exhibit R.

10.     I have personally reviewed the documents referenced herein to authenticate them, and could testify thereto if required.

I hereby declare under the penalty of perjury pursuant to the Laws of the United States of America that the above statements are true and correct.  This Declaration is made the 04th day of March 2022 at Singen, Germany.

ROLF PREUSCHOFF
Director, Supply Chain Management