**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOSE MUNIZ, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 18-4619 |
| | : | |
| STOBER *et al.*, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

**SCHMEHL, J. /s/ JLS**                                    **October 19, 2023**

Plaintiff Josue Muniz (whose name was apparently misspelled in the operative pleadings as "Jose") initiated this negligence and strict products liability action after suffering gruesome injuries from operating a cross-cutting blade-and-saw machine for his employer, Palram Company. Defendant Breyer GmbH Maschinenfabrik ("Breyer"), who designed and manufactured the machine, now moves this Court to grant summary judgment on the grounds that the machine was not being used by an intended user for its intended purpose, the operation of the machine amounted to misuse and highly reckless conduct, and Palram's modification of the machine was the relevant cause of Mr. Muniz's injury. For the following reasons, the Court denies Breyer's Motion.

## I.    BACKGROUND

Mr. Muniz began working as a temporary employee for Palram in October or November 2016, where his responsibilities came to include cutting sheets of plastic for recycling. (Joint Statement of Stipulated Material Facts ("JSSMF") ¶¶ 19, 23, ECF No. 96.) The machine used for such cutting was made by Breyer and was unique to the extent that it combined both a knife-like blade for thinner plastic and a saw for thicker plastic. (*Id.* ¶ 7; Preuschoff Dep. 18:10–19:16, ECF

No. 96-1 Ex. C.)  Breyer did not subsequently repair or modify the machine after its delivery to Palram.  (*Id.* ¶ 8.)  Palram used the machine for several years, put it out of service "for a time," and then "recommissioned [it] for use in cutting plastic scrap so it could be recycled."  (*Id.* ¶¶ 9– 10.)

Some time into Mr. Muniz's employment, Palram offered that he could work using the machine to cut plastic for recycling, and Mr. Muniz "received instruction on the Machine from a Palram employee."  (JSSMF ¶¶ 21–22.)  In his new role, Mr. Muniz did not directly operate the machine.  (*Id.* ¶ 22.)  Instead, he worked with three other temporary employees (*id.* ¶ 23):  one worked at the machine's operator's panel, the other two fed plastic sheets into the machine (*id.* ¶ 24), and Mr. Muniz then grabbed the cut plastic from the machine's output and put it on a pallet for a forklift to take away (*id.* ¶¶ 22, 25).  The cutting process involved the two feeder employees and Mr. Muniz holding in place the uncut sheet of plastic, the operator employee pushing a button to lower a clamping bar onto the plastic, a blade cutting along the clamping bar, the raising of the clamping bar, and Mr. Muniz's task of retrieving the cut plastic and placing it on a pallet.  (*Id.* ¶ 26–27.)

When Mr. Muniz first began this role, he and the two feeder employees manually placed the plastic sheets onto the machine and under the clamping bar; eventually, however, they would feed the machine with plastic that was coiled around a wooden roll.  (Witness Statement of Josue Muniz to OSHA ("Muniz OSHA Statement") at 2, ECF No. 96-1, Ex. J.)  Before the accident, the employees experienced various problems with the machine, including that the machine would stop and start unexpectedly, and that the blade would occasionally either not make a full cut or would not return to its starting position after completing a cut.  (*Id.* at 3.)  The employees reported such issues to a supervisor "about two to three times a week," and that supervisor would in turn call maintenance.  (*Id.* at 3–4.)  On one occasion, a maintenance worker told an employee that

"something is wrong with the E-Stop or the start button." (*Id.* at 4.) The employees experienced issues with the machine on the day of the accident, and maintenance workers had looked at the machine twice that day. (*Id.*)

On December 13, 2016, when the accident occurred, Mr. Muniz was holding onto the plastic sheet and indicated to the operator that he could begin cutting. (JSSMF ¶¶ 28–29.) Unexpectedly, "the plastic suddenly started to retract back towards" the coiled roll (*id.* ¶ 29), causing Mr. Muniz's right hand to become stuck under the now-lowered clamping bar (Muniz Dep. at 113:4–15, ECF No. 96-1 Ex. K). Mr. Muniz tried to free himself and yelled to the operator to press an emergency stop button. (JSSMF ¶ 30.) The operator indeed pressed the button, but the machine did not stop. (*Id.*) The blade cut across the clamping bar, and Mr. Muniz "felt his hand go numb." (*Id.* ¶ 31.) He later testified that his hand was 90 or 98 percent amputated. (Muniz Dep. at 120:25–121:4.) Emergency responders arrived within 15 to 20 minutes and had to apply a tourniquet to Mr. Muniz. (Muniz OSHA Statement at 5.)

## II.    JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over the claims in this matter pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and Mr. Muniz seeks relief in excess of $75,000, exclusive of interests and costs. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because Mr. Muniz's accident happened within this District, making it one in which a substantial part of the events or omissions giving rise to his claim occurred.

On a motion for summary judgment, the court must consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted). Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). "Facts that could alter the outcome are

'material facts,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (quoting *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).

If the movant carries its initial burden of showing the basis of its motion, the burden shifts to the non-moving party to go beyond the pleadings and point to "specific facts showing that a genuine issue exists for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  In other words, the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Podobnik v. US. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (citation and internal quotation marks omitted).  Summary judgment must be granted against a non-moving party who fails to sufficiently "establish the existence of an essential element of its case on which it bears the burden of proof at trial." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

## III.    ANALYSIS

Mr. Muniz brings one claim of negligent design and manufacture of the machine at issue (Count I) and three strict product liability claims concerning design defect (Count II), manufacturing defect (Count III), and failure to warn (Count IV).  For each strict liability claim, Mr. Muniz "must establish only two things:  that the product was sold in a defective condition 'unreasonably dangerous' to the user, and that the defect caused [Mr. Muniz's] injury." *Phillips v. A-Best Prod. Co.*, 542 Pa. 124, 131 (1995) (footnote omitted) (quoting *Walton v. Avco Corp.*, 530 Pa. 568, 576 (1992)).  Further, "a manufacturer can be deemed liable only for harm that occurs in connection with a product's intended use by an intended user." *Pennsylvania Dep't of Gen. Servs. v. U.S. Min. Prod. Co.*, 587 Pa. 236, 253 (2006).  Breyer seeks dismissal of this action on various grounds:  (1) Mr. Muniz was not an intended user of the machine because Palram failed to

adequately train him to use it, and Mr. Muniz was not putting the machine to its intended use; (2) Mr. Muniz's conduct reflected misuse of and highly reckless conduct with the machine; and (3) Palram's modification of the machine caused Mr. Muniz's injury.

### A. Whether Mr. Muniz Was an Intended User Putting the Machine to Its Intended Use

#### 1. Intended User

Breyer argues that Mr. Muniz was not an intended user of the machine because Palram failed to adequately train him. Breyer points to the fact that Mr. Muniz only watched two general safety videos and was otherwise "trained" on-the-job by another employee to grab the cut plastic sheets and place them on a pallet. And although the parties dispute whether certain manuals were located at the machine or elsewhere on Palram premises, it appears to be undisputed that Mr. Muniz did not read any manual explaining machine operation or safety.

The Pennsylvania Supreme Court has held that "a product need be made safe only for its intended user." *Phillips v. Cricket Lighters*, 576 Pa. 644, 653 (2003) (plurality opinion). This Court must assess Breyer's *actual* intended user, not "any reasonably foreseeable user," as the latter "would improperly import negligence concepts into strict liability law." *Id.* at 657. In *Phillips*, a two-year-old child accessed a Cricket butane lighter from his mother's purse and, in part because the lighter lacked any childproof features, ultimately caused a house fire that killed multiple people. *Id.* at 649. The *Phillips* court, however, affirmed summary judgment because the plaintiff "d[id] not contest that the butane lighter was intended to be used solely by adults, and not a two year old." *Id.* at 657.

Most other unintended user cases involve children operating a product intended for adults. *See, e.g.*, *Hysick v. Razor USA, LLC*, 2017 WL 4084054, at *4–5 (M.D. Pa. Jan. 9, 2017) (child six years younger than the recommended age range for a motorbike was not an intended user).

Such cases may be unsurprising given that children often lack the physical capacity or requisite knowledge to use potentially dangerous products safely.  The case here presents a much closer call, however.  Breyer points to a lack of training—in other words, a lack of the requisite knowledge—but seeks to apply that to an adult who used the machine in the course of his employment and had received *some* training from coworkers, however informal.

Certain Pennsylvania cases appear to implicitly support the position that an employee may not be an intended user if they lack the presumptive knowledge of such user.  *See, e.g.*, *Mackowick v. Westinghouse Electric Corp.*, 525 Pa. 52, 54, 56 (1990) (rejecting the plaintiff's claim that warnings on an electrical capacitor should have provided greater detail about arcing, a phenomenon whereby an electrical current jumps from one point to another, because "[t]he duty to adequately warn does not require the manufacturer to educate a neophyte in the principles of the product," and "[a] warning of inherent dangers is sufficient if it adequately notifies the intended user of the *unobvious* dangers inherent in the product"); *cf. Riley v. Warren Mfg., Inc.*, 688 A.2d 221, 229 (Pa. Super. Ct. 1997) (child was not an intended user because "[t]he [allegedly defective product] was a sophisticated piece of industrial machinery, to be used by an *educated* group of industrial consumers," and "[i]ts normal and intended use was to be by the *trained* employees of AgCom who were responsible for hauling the bulk feed to farms" (emphasis added)).

On the other hand, there is a degree of absurdity in Breyer's position.  Holding that a man whose work responsibilities included cutting sheets of plastic for recycling was not an intended user of a machine that does exactly that "would require the Court to 'put on blinders,'" *Lynn ex rel. Lynn v. Yamaha Golf-Car Co.*, 894 F. Supp. 2d 606, 634 (W.D. Pa. 2012) (quoting *Beard v. Johnson & Johnson, Inc.*, 615 Pa. 99, 121 (2012)), and at least some Pennsylvania courts have expressed similar positions, *see Est. of Hicks v. Dana Companies, LLC*, 984 A.2d 943, 977 n.21 (Pa. Super. Ct. 2009) ("Finding that a child is not an intended user of a lighter and therefore the

plaintiff failed to show that the lighter was unsafe for use by adults is not analogous to finding that a laborer, who is required as part of his job to work closely with tradesmen who handle asbestos-containing products, is not an intended user of those products.  Moreover, Appellants cannot seriously contend that plumbers and pipefitters are not intended users.  As such we find it hard to fathom how a plumber's or pipefitter's helper is not also an intended user.").

Given these authorities and the limited state of the record concerning the extent of Mr. Muniz's training (or lack thereof), the Court finds that Breyer has not established that it is entitled to summary judgment on the grounds that Mr. Muniz was not an intended user of the machine. Put differently, the Court cannot say that the record before it supports the position that Mr. Muniz's informal, on-the-job training left him so uninformed about the safe operation of the machine that he was not an intended user of it, akin to a child using a lighter or motorbike.  *Cf. Palmer v. R.A. Jones & Co.*, 2005 WL 8176765, at *1 n.1 (E.D. Pa. Aug. 15, 2005) (denying summary judgment motion where the parties disputed whether the plaintiff was an intended user "because the cartoner was designed to be operated by only one person and Plaintiff was not assigned to operate the cartoner on the day of her injury").  Mr. Muniz's employer may have been negligent in preparing him to use the machine, but Pennsylvania courts impose strict limits on the incorporation of negligence concepts into strict liability claims, *see Phillips*, 576 Pa. at 656 ("[W]e . . . reaffirm that in this jurisdiction, negligence concepts have no place in strict liability law."), and this Court will not do so here—at least not in connection with an analysis of the machine's intended user.  As discussed below, the conduct of Mr. Muniz and his employer may bear on affirmative defenses that speak to the causation of his injury.

### 2.      Intended Use

As with the analysis of an allegedly defective product's intended user, when assessing such product's intended use, this Court will not consider foreseeability.  *Pennsylvania Dep't of Gen.*

*Servs.*, 587 Pa. at 253 ("[T]he general rule is that there is no strict liability in Pennsylvania relative to non-intended uses even where foreseeable by a manufacturer." (citing *Phillips*, 576 Pa. at 656–57)).  To discern a product's intended use, the Court should instead consider the product's manuals and warning labels.  *Clevenger v. CNH Am., LLC*, 2008 WL 2383076, at *4 (M.D. Pa. June 9, 2008) (gathering cases), *aff'd*, 340 F. App'x 821 (3d Cir. 2009).

The putative operating instructions here provide as follows:

- The cross cutting device is intended and suitable for the transverse cutting of thermoplastic double wall sheets. . . .

- Intended use also excludes any modification of the machine without Breyer's prior consent. . . .

- This stand-alone cross cutting equipment must only be operated by one man.

(Operating Instructions § 1.2, ECF No. 96-1 Ex. H; *see also* JSSMF ¶ 14.)  Also included in a diagram in the operating instructions is a depiction of an "[i]nlet roller conveyor table," the feature that Palram subsequently removed so that employees could use the wooden roller to feed the machine with plastic.  (Operating Instructions § 4.1, fig. 4-2.)  A separate document referred to as the safety instructions incorporates the operator's manual and requires compliance therewith.  (Safety Instructions § 1.1, ECF No. 96-1 Ex. I.)[1]  Mr. Muniz notes, however, that neither these

---

[1]     The Court refers to these instructions as "putative" because Mr. Muniz argues that they apply to a different machine than the one involved in this case.  The operating and safety instructions refer to Breyer's "extrusion lines," and the latter provides that "[t]he machine is determined only for the extrusion of the thermoplastics mentioned in the purchase contract." (Safety Instructions § 2.)  Coupled with deposition testimony that extrusion machines are different from the one at issue here, Mr. Muniz argues that Breyer has not submitted to the Court the relevant manuals.  A closer read of the deposition reveals potential holes in Mr. Muniz's theory, however.  Breyer's corporate representative, Rolf Preuschoff, testified that the machine at issue was not an extrusion machine because extrusion machines fuse "granules of plastic" into "a hot, molten plastic material," whereas the machine relevant to this case cut plastic for recycling.  (Preuschoff Dep. at 12:3–10.)  The operating instructions clearly depict a machine that cuts plastic, not one that produces molten plastic material.  And other than mentioning "Breyer extrusion lines" on the cover

instructions nor any warning labels identified the inlet roller conveyor table as a safety feature that should not be removed.

Breyer contends that the machine was not put to its intended use because Mr. Muniz and his coworkers were cutting plastic from a coiled roll in a multi-person team.  In general, Mr. Muniz was putting the machine to its intended use:  cutting plastic sheets for recycling.  Breyer's arguments to the contrary speak more to the affirmative defense of misuse/recklessness, discussed below.  Indeed, a Pennsylvania court confronted with similar arguments reversed the lower court's grant of summary judgment and explained as follows:

> [T]he trial court conflated the doctrine of unintended use with the concept of misuse.  [The defendant's] defense was that [the plaintiff] was not using the ATV in accordance with the instructions that he received with that vehicle.  Those instructions provided that the ATV should not be used under the influence of drugs or alcohol and that the ATV should not be backed down a hill.  [The plaintiff] had taken OxyContin for pain associated with a pre-existing back injury in accordance with his prescription for that drug.  In addition, he had imbibed a small amount of beer.  Finally, he was backing his ATV down a hill in first gear in order to avoid striking other ATV users who were over the hill and out of his sightline.  These actions relate to the defense of misuse of the product in that the ATV was not being used in accordance with the manufacturer's instructions.

*Smith v. Yamaha Motor Corp., U.S.A.*, 5 A.3d 314, 321 (Pa. Super. Ct. 2010).  Accordingly:

> [T]he trial court erred in concluding that [the plaintiff] was not using the ATV as intended.  An ATV is an off-road vehicle and its intended utilization is to be driven in an off-road setting.  The ATV at issue herein clearly was being used for that purpose at the time of this accident.  [The plaintiff] was operating the ATV on a trail in a wooded area when the accident occurred.  This case bears no

---

page, the operating instructions make no further reference to extrusion.  The safety instructions indeed mention extrusion on the cover page and twice in the text of the instructions (*see* Safety Instructions §§ 2, 3.13), but this may be the result of a translation error or other typographical issue.  Either way, the Court finds that the operating instructions clearly do not refer to the kind of extrusion machine discussed by Mr. Preuschoff, and the Court's analysis of the machine's intended use relies predominantly on those instructions, not the arguably more problematic safety instructions.

> resemblance to either *Pennsylvania Department of General Services* or *Phillips*. Building materials are intended to be installed in structures and not to be incinerated. Similarly, lighters are manufactured so that adults may ignite cigarettes, candles or fires; they are not designed to be utilized by children as a toy or plaything. However, ATVs are designed to be driven in an off-road setting, and [the plaintiff] was utilizing the ATV in that capacity when the accident occurred.

*Id.* Application to this case of the distinction between intended use and misuse/recklessness leads to the rejection of Breyer's position. Further, even a more granular look at the operating instructions yields the same result.

Specifically as to the removal of the inlet roller conveyor table and the use of a coiled roll in its place, the Court finds that a reasonable juror could find in favor of Mr. Muniz's position that such conduct fell within the intended use of the machine. Although the operating instructions warn against modifying the machine without Breyer's consent, they also contemplate removal and realignment of the roller conveyor tables. (Operating Instructions § 7.4.) They likewise do not identify the tables as an essential safety feature. (*Id.* §§ 1.1–1.3 (discussing safety features but not mentioning the tables).) Further, it appears to be possible that Mr. Muniz and his coworkers could have kept the inlet roller conveyor table in place and fed plastic across that table from a coiled roll, and nothing in the operating manual expressly disavows that approach.

As to the use of a multi-person team, the operating instructions do provide that "[t]his stand-alone cross cutting equipment must only be operated by one man." (*Id.* § 1.2.) Mr. Muniz takes a narrow view of this language and argues that there was only one man "operating" the machine—namely, the lone employee who worked at the operator's control panel. Although at first blush this may seem a fanciful distinction, the safety instructions indeed contemplate having multiple people working with the machine, only one of whom is referred to as the "operator." In particular, they provide, albeit in a somewhat tortured translation, that "[t]he operator is engaged

to have worked persons at the line only who" are familiar with certain regulations and instructions. (Safety Instructions § 1.2; *see also id.* §§ 1.1, 1.3 (referring to "all persons" engaged with the machine).)  The safety instructions appear to contemplate a team of workers elsewhere as well:

- Only trained and commissioned staff may be around the line and is allowed to work on it.

- The responsibilities of the staff concerning the mounting, starting-up, operating, preparing and maintaining have to be clearly fixed.

- Persons who are trained for handling the machine may only work on the machine under the supervision of an experienced person.

(*Id.* § 3.5.)  From this record, the Court cannot say that having a team of workers assisting an "operator" at the control panel constitutes an unintended use of the machine.  Accordingly, the Court rejects Breyer's position that Mr. Muniz was not an intended user putting the machine to its intended use.

### B.   Misuse and Highly Reckless Conduct

#### 1.   Preliminary Issues Concerning Foreseeability and Causation

As to Breyer's second basis for summary judgment, Pennsylvania courts have recognized that defendants of strict liability claims may refute causation by demonstrating "evidence of a plaintiff's voluntary assumption of the risk, misuse of a product, or highly reckless conduct . . . ." *Charlton v. Toyota Indus. Equip.*, 714 A.2d 1043, 1047 (Pa. Super. Ct. 1998).  Of these three grounds, Breyer focuses only on misuse and highly reckless conduct.  Misuse is present where "the use employed by [the plaintiff] was either unforeseeable or outrageous." *Childers v. Power Line Equip. Rentals, Inc.*, 452 Pa. Super. 94, 108 (1996).  To establish highly reckless conduct, a defendant must "show that [the plaintiff] knew or had reason to know of facts which created a high degree of risk of physical harm to himself or that he deliberately proceeded to act, or failed to act, in conscious disregard of that risk." *Id.*; *see also Reott v. Asia Trend, Inc.*, 618 Pa. 228, 242–43

(2012) (noting the similarity between misuse and highly reckless conduct, as "[b]oth . . . involve a plaintiff's unforeseeable, outrageous, and extraordinary use of a product").

Notwithstanding that the foregoing misuse/recklessness defense to strict liability implicates a foreseeability analysis, Breyer argues that such foreseeability applies only to negligence claims; otherwise, "the general rule is that there is no strict liability in Pennsylvania relative to non-intended uses *even where foreseeable* by a manufacturer." *Gaudio v. Ford Motor Co.*, 976 A.2d 524, 533 (Pa. Super. Ct. 2009) (emphasis added) (quoting *Pennsylvania Dep't of Gen. Servs.*, 587 Pa. at 253). The Pennsylvania Supreme Court in *Reott*, however, provided for an affirmative misuse/recklessness defense (and its incorporation of foreseeability) "in a Section 402A action," *i.e.*, a strict liability action. If, as a general matter under *Gaudio*, strict liability does not attach even for *foreseeable* unintended uses, the utility of a misuse/recklessness defense that, in part, requires showing that a plaintiff's misuse was *unforeseeable* is not immediately apparent. But as the lower court in *Reott* explained, and as this Court discussed above, unintended use and misuse/recklessness are not the same concept under Pennsylvania law. *Reott v. Asia Trend, Inc.*, 7 A.3d 830, 840 (Pa. Super. Ct. 2010), *aff'd*, 618 Pa. 228 (2012). A misuse/recklessness defense "relates to the causation of plaintiff's injuries" and assesses whether the plaintiff's conduct severs the causal link between the allegedly defective product and the plaintiff's injury, whereas the concept of unintended use exculpates a manufacturer regardless of whether some aspect of the product caused the injury. *Id.* at 840–41; *see also Facciponte v. Briggs & Stratton Corp.*, 2011 WL 614761, at *11–13 (M.D. Pa. Feb. 11, 2011) (even though the plaintiffs' use of a generator was indeed its intended use, there remained an issue of fact, pursuant to a misuse/recklessness defense, "as to whether decedents' conduct or defendants' failure-to-warn caused the decedents' deaths"). Accordingly, to the extent that Breyer argues that this Court should not consider foreseeability in connection with Breyer's misuse/recklessness defense to strict liability, the Court

rejects that position.  Instead, the Court first considered above, without regard to foreseeability, whether Mr. Muniz was an intended user putting the machine to its intended use; now, the Court moves on to consider whether his conduct was nonetheless so outrageous or unforeseeable that a misuse/recklessness defense precludes liability for Breyer.

Another preliminary issue relevant to the misuse/recklessness defense is the type of causation that the Court must consider.  The Pennsylvania Supreme Court in *Reott* cautioned against the possibility that this defense might smuggle in "concepts of comparative/contributory negligence" and explained that, accordingly, such misuse or recklessness must have been "the sole or superseding cause of the injuries sustained."  618 Pa. at 245, 250.  As the *Reott* court explained, these concepts are distinct:  "a defendant can affirmatively plead and prove 'sole cause,' *i.e.*, that a curing of any defect would not have prevented the injury because only the plaintiff's conduct caused the injury; or 'superseding cause,' *i.e.*, that the plaintiff acted in such an outrageous and unforeseeable fashion that the conduct superseded any 'but for' or legal causation the product contributed to the injuries."  *Id.* at 248.  That same court, however, later characterized sole and superseding cause as lacking "any substantive difference . . . in plaintiff misconduct cases" and even noted a *third* causation variant, "factual cause," as the variant that "most faithfully adhere[s]" to "Pennsylvania jurisprudence."  *Id.* at 249 n.13.  The Pennsylvania Suggested Standard Civil Jury Instructions define a "factual cause" as a but-for cause that "must have been an actual, real factor in causing the harm, even if the result is unusual or unexpected," though a factual cause "need not be the only factual cause."  Pa. SSJI (Civ) § 13.20.

As at least one sibling court has commented, this guidance leaves something to be desired. *Cote v. Schnell Indus.*, 2022 WL 16815032, at *8 (M.D. Pa. Nov. 8, 2022) ("This Court finds the Pennsylvania Supreme Court's approach to this issue perplexing.  It seems insensible to, in the rule, insert a disjunctive delineating two distinct legal concepts [*i.e.*, sole and superseding cause],

while, in a footnote, explaining that these concepts are substantively indistinguishable.").  Further, asking whether a plaintiff's misuse or recklessness was a "factual cause" of his injury likely smuggles in the very "concepts of comparative/contributory negligence" that the *Reott* court ostensibly sought to exclude from strict liability cases.  *See* Pa. SSJI (Civ) § 13.20 (framing the definition of "factual cause" in the negligence context).  Indeed, the only practical approach for courts following the *Reott* decision is to consider sole cause and superseding cause without reference to the comparative/contributory negligence elements of factual cause, *see, e.g.*, *Zimmerman v. Alexander Andrew, Inc.*, 189 A.3d 447, 456–57 & n.2 (Pa. Super. Ct. 2018) (reversing summary judgment on misuse/recklessness defense in part because the defendant failed to show that the plaintiff's "conduct was the sole or primary cause of his injuries"), and this Court finds it appropriate to do the same.

### 2. Whether Breyer Is Entitled to Summary Judgment on the Misuse/Recklessness Affirmative Defense

Considering the present facts and drawing reasonable inferences in the light most favorable to Mr. Muniz, the Court cannot find that Mr. Muniz's conduct with the machine represents an "unforeseeable, outrageous, and extraordinary use of a product" that was the sole or superseding cause of his injuries.  *Reott v. Asia Trend, Inc.*, 618 Pa. at 243, 249.  The operating instructions contemplate removal of the inlet roller conveyor table, and Mr. Muniz's expert opined that if the table was intended to be an essential safety feature, it should have been described as such in manuals or warning labels and should have been less easy to remove.  (Prelim. Eng'g Report at 5–7, ECF No. 102-1 Ex. 1.)  Breyer responds, fairly, that the machine's circuitry would have been incomplete without the inlet roller conveyor table and, as a result, would not have been operable absent modification of that circuit.  Indeed, the record supports the claim that after removing the table, Palram had to insert a device to artificially close the circuit.  (*See* Follweiler Dep. at 36:24–

37:3, 177:9–12, 194:9–195:9, ECF No. 96-1 Ex. O.)  Further, the operating instructions make clear that Palram should not modify the machine without first obtaining Breyer's approval.  Given the foregoing conflicting evidence, a jury must decide whether the inlet roller conveyor table was such an implicitly or explicitly essential safety feature that when Palram removed it, the subsequent operation of the machine amounted to an unforeseeable, outrageous, and extraordinary use of the machine.

The issue of causation as to this issue is likewise a matter for the jury to decide.  Even if the Court concedes that Mr. Muniz's injury would not have happened but for the use of the coiled roll of plastic instead of the inlet roller conveyor table, that does not make that use the sole or superseding cause of the injury.  The Court explained above why a jury must decide whether the use of the coiled roll of plastic was so outrageous and unforeseeable that it superseded any alleged defect in the machine.  Further, Mr. Muniz's expert has identified alleged defects *unrelated* to the inlet roller conveyor table, including that the machine lacked a hand sensor under the clamp and lacked a "staged sequence of operation" that would have separated the lowering of the clamp and the cutting of the blade or saw into two stages.  (Prelim. Eng'g Report at 6–7.)

Accordingly, Breyer is not entitled to summary judgment based on its affirmative defense of misuse/recklessness.[2]

_____

[2]     These same issues preclude summary judgment on Mr. Muniz's negligence claims.  Breyer argues that his injuries resulted from his alleged misuse of the machine, not any cause attributable to Breyer.  Breyer also argues that it owes no duty of care as to unforeseeable uses of the machine. But the Court's above findings clearly apply here:  A jury should decide whether the misuse of the machine (1) was so outrageous as to be unforeseeable, and (2) amounted to a superseding cause notwithstanding the other alleged defects identified by Mr. Muniz's expert.

C.       **Palram's Modification of the Machine**

Under Pennsylvania law, "a manufacturer or seller is not liable for injuries caused by a defective product if the defect was created by a substantial alteration in the product amounting to a supervening or intervening cause of the plaintiff's injuries." *Davis v. Berwind Corp.*, 640 A.2d 1289, 1297 (Pa. Super. Ct. 1994), *aff'd*, 547 Pa. 260 (1997).  In particular, the "removal of a safety device . . . against the warnings of the manufacturer" amounts to "an intervening or superceding cause of the injury, breaking the chain of causation and relieving the manufacturer of liability." *Id.* at 1300.  In the foregoing analysis of Breyer's misuse/recklessness defense, this Court explained the conflicting evidence about the foreseeability of Palram's removal of the inlet roller conveyor table and Mr. Muniz's subsequent use of that modified machine.  Those same conflicts preclude summary judgment on the present theory.

They also demonstrate how this case may differ from ones like *Davis* and its progeny.  In *Davis*, the manufacturer "provided a safety device, . . . provided additional warnings on the discharge doors of the [product], and . . . included a product manual warning against removal of the safety device.  *Id.* at 1299–1300.  The Pennsylvania Supreme Court, reviewing the *Davis* Superior Court's decision, emphasized the manufacturer's specific and unequivocal warnings about the safety device:  "We find untenable the proposition that a manufacturer must anticipate that a specific warning *not* to operate a product without a safety device indicates to a user that the product *could*, in fact, be operated without the safety feature." *Davis v. Berwind Corp.*, 547 Pa. 260, 269–70 (1997).  Likewise, in *Roudabush v. Rondo, Inc.*, the court found that the plaintiff's employer had substantially altered a machine by removing a safety feature and re-wiring the machine's circuitry to run without the safety feature.  2017 WL 3912370, at *3 (W.D. Pa. Sept. 5, 2017).  As in *Davis*, however, the *Roudabush* court cited "clear warnings in the operating manual that explicitly warned against tampering with the machine's safety mechanisms." *Id.* at *5.

Here, the operating and safety instructions failed to identify the inlet roller conveyor table as a safety feature, let alone an essential one that could not be removed.  For example, the "Danger Signs and Safety Devices" section of the operating instructions do not mention the table at all. (Operating Instructions § 1.3 & fig. 1-1.)  A section specifically devoted to the inlet roller conveyor table likewise does not mention its putative role as a safety feature.  (*Id.* § 7.4.)  In the instant case, the safety instructions do not mention the table *at all*.  Nor has Breyer suggested that any warning labels on the machine identified the table as a safety feature.  Breyer will undoubtedly argue that both instructions prohibit any modification of the machine without Breyer's consent (*id.* § 1.2; Safety Instructions § 3.12) and the machine's circuitry was incomplete absent the table.  These general and implicit warnings may suffice to establish that Breyer could not have foreseen the subsequent removal of the table, but that should be up to a jury to make that decision.  *See Davis*, 640 A.2d at 1297 ("Foreseeability is a question for the factfinder unless the inferences are so clear that a court can say as a matter of law that a reasonable manufacturer could not have foreseen the change.").

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion is denied.  A corresponding order accompanies this memorandum.